# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 31, 2019

Lyle W. Cayce
Clerk

No. 17-11477

In the Matter of:  LIFE PARTNERS HOLDINGS, INCORPORATED

     Debtor.

----------------------------------

LIFE PARTNERS CREDITORS' TRUST; ALAN M. JACOBS, As Trustee for
Life Partners Creditors' Trust,

     Appellants,

v.

FRED A. COWLEY; GALLAGHER FINANCIAL GROUP; EDWARD G.
BURFORD CORPORATION; FAYE BAGBY; ELLA OLIVER, doing business
as Investingmakesmesick.com; WEALTHSTONE FINANCIAL; FALCO
GROUP, L.L.C.; MARK MCKAY; KAINOS ASSET MANAGEMENT, L.L.C.;
LIFE SETTLEMENT EXCHANGE, L.L.C.,

     Appellees.

Appeals from the United States District Court
for the Northern District of Texas

Before ELROD, HIGGINSON, and ENGELHARDT, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case arises out of the Chapter 11 bankruptcies of three related entities: Life Partners Holdings, Inc.; Life Partners, Inc. (LPI); and LPI Financial Services (collectively, the "LP Entities").  The LP Entities operated an investment business focused on the sale of interests in life insurance

policies, through which they defrauded investors and violated securities laws. *See Moran v. Pardo*, No. 4:15-cv-00905, Dkt. No. 359 (N.D. Tex. June 12, 2017); *see also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 789 (5th Cir. 2017). The LP Entities used a multi-level marketing structure to sell their life insurance investments, contracting with individuals and entities they called "Licensees" to refer potential investors in exchange for sales commissions. The bankruptcy trustee filed five adversary proceedings[1] against various groups of these Licensees, asserting claims under the Bankruptcy Code and on behalf of individual investors. Life Partners Creditors' Trust (Creditors' Trust)—an entity created by the Chapter 11 plan—was later substituted as plaintiff in these proceedings.

The district court granted the Licensees' motions to dismiss all of Creditors' Trust's claims and declined to allow repleading. The district court also denied Creditors' Trust's motion for reconsideration. We AFFIRM in part and REVERSE and REMAND in part.

## I.

## A.

In 1991, Brian Pardo founded LPI for the purpose of selling "viaticals"—investments in life insurance policies that the insureds had sold to third parties.[2] LPI's parent company, Life Partners Holdings, and a related entity, LPI Financial Services, were also engaged in this business. The LP Entities

---

[1] This appeal is from the district court's judgment in one of the five adversary proceedings. The other four cases remain pending before our panel: Nos. 17-11480, 17-11488, 18-10051, and 18-10056.

[2] The facts in this section are taken from Creditors' Trust's third amended complaint—the live pleading at the time of dismissal—because at the motion to dismiss stage, we "must accept as true all of the allegations contained in [the] complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014) ("[W]e accept all well-pleaded factual allegations as true and interpret the complaint in the light most favorable to the plaintiff[.]").

## No. 17-11477

used a multi-level marketing structure to promote their investment offerings to investors. First, the LP Entities contracted with "Master Licensees" to (1) refer potential investors to the LP Entities and (2) recruit additional licensees. The licensees recruited by Master Licensees—called "Referring Licensees"—would in turn enter into two contracts: one with the LP Entities to refer potential investors, and another with the Master Licensee to facilitate their sharing of the commissions received from the LP Entities' sales. The LP Entities produced offering materials for both types of Licensees to distribute to potential investors.

Through their Licensees, the LP Entities sold life insurance policies in shares referred to as "fractional interests." Under their investment contracts with the LP Entities, the investors funded an escrow account with sufficient funds to keep the policies in effect during the life expectancies of the insureds as estimated by the LP Entities on their offering materials. If the insureds survived beyond the LP Entities' estimate, the investors also agreed to contribute additional funds for premiums until the policies reached maturity.

Initially, the LP Entities focused on policies in which the insureds had been diagnosed with AIDS because the disease shortened the insureds' life expectancies in comparison to the actuarial life expectancies used by insurance companies. However, shortly after the LP Entities entered the viaticals market, medical advances significantly increased life expectancies for AIDS patients. As a result, by 2004, the LP Entities had pivoted their business model to focus on elderly insureds who were terminally ill—individuals whose life expectancies would presumably also be shorter than the actuarial estimates. The LP Entities hired Dr. Donald Cassidy to identify appropriate insureds and estimate their life expectancies.

However, it soon became apparent that Dr. Cassidy did not have the ability to perform either task with any accuracy. Of the 302 policies that the

No. 17-11477

LP Entities originated between 2004 and 2007, Dr. Cassidy predicted that 157 would mature by the end of 2007. Only seven matured during that time. Undeterred, the LP Entities continued to use the inaccurate life expectancies to set the purchase price of the fractional interests, which resulted in the LP Entities overcharging investors. In addition, the offering materials distributed by the Licensees continued to represent that the insureds had short life expectancies when their life expectancies were likely no shorter than the actuarial estimates.

According to Creditors' Trust, the LP Entities' offering materials also contained numerous other misrepresentations regarding the life insurance industry and the LP Entities' investment offerings. Most of these misrepresentations were related to Dr. Cassidy's flawed life expectancy estimates, which the LP Entities used to support their claims that the fractional interests were sound investments with a "superior yield potential," that the policies would mature relatively quickly, that the investments were low-risk even if the LP Entities' life expectancy predictions were incorrect, that the LP Entities' prices were appropriate, and that the LP Entities had a positive track record with past life insurance investments. These misrepresentations form the basis of several of Creditors' Trust's claims against the Licensees.

Over a twelve-year period, the LP Entities raised more than $1.8 billion from the sale of more than 100,000 fractional interests to investors. Even when investors began expressing doubts because policy maturities were long overdue and media coverage suggested Dr. Cassidy's predictions were inaccurate, Pardo and other LP Entities insiders continued to represent that Dr. Cassidy's predictions were accurate and that the policies would mature imminently. The Licensees disseminated these representations to the investors.

4

No. 17-11477

Throughout this time, the Licensees received commissions and fees under their contracts with the LP Entities. Between 2008 and 2015, these commissions and fees totaled more than $27.6 million. While investors knew that a portion of their investment funds would be used to pay fees, they were not given specifics as to how that money was distributed. On average, the Licensees received 12% of the money an investor provided in exchange for a fractional interest, which was well above the industry standard for a commission in a securities transaction.

Due to the large commissions paid to the Licensees—as well as large distributions made to Pardo and other LP Entities executives—Creditors' Trust alleges that the LP Entities were insolvent for much of their existence prior to filing for bankruptcy. Because the life settlements were bad investments, each new purchase of a fractional interest created a liability to the investor. And because the LP Entities were depleting all their resources on commissions and distributions, they did not have sufficient funds to cover those liabilities. Instead, the LP Entities—through the Licensees—continued to recruit new investors to keep the business funded. Eventually, however, the LP Entities no longer had enough capital to conduct their business operations or continue maintaining the policies that had not yet matured.

As the fraudulent practices of the LP Entities came to light through media coverage, investors began to file class action lawsuits against the companies. *See, e.g.*, *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at *1–2 (N.D. Tex. July 9, 2013). In addition, the SEC began investigating the LP Entities. The SEC filed suit based on its findings, and the Western District of Texas found that Pardo had "knowingly—or at least recklessly—violated securities laws." *SEC v. Life Partners Holdings, Inc.*, 71 F. Supp. 3d 615, 619 n.1 (W.D. Tex. 2014), *vacated in part and rev'd in part on other grounds*, 854 F.3d at 789.

5

No. 17-11477

B.

On January 20, 2015, Life Partners Holdings filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. The Chapter 11 trustee filed bankruptcy petitions on behalf of the LP subsidiaries, LPI and LPI Financial Services, on May 19, 2015.

The Chapter 11 trustee then filed a series of adversary proceedings on behalf of the bankruptcy estates. One of the proceedings targeted Pardo and other LP Entities executives and insiders. *See Moran*, No. 4:15-CV-905, Dkt. No. 16 (amended complaint). The district court assigned to that case withdrew the bankruptcy reference and denied the defendants' motions to dismiss, some of which raised arguments similar to those raised by the Licensees here. *Id.* Dkt. Nos. 5, 192. The case proceeded to trial, where a civil jury found that Pardo was liable for fraud and that Pardo and other LP insiders were unjustly enriched. *See id.* Dkt. No. 359 (jury verdict). The district court's final judgment awarded the LP Entities' bankruptcy estates and the plaintiff-investors in the case more than $40 million in damages. *Id.* Dkt. No. 440 (final judgment).

The five related adversary proceedings before this panel target the LP Entities' Licensees. The Chapter 11 trustee filed the original complaint in this adversary proceeding in October 2015. The Chapter 11 trustee amended the complaint twice before the bankruptcy judge abated all adversary proceedings pending confirmation of the Chapter 11 plan. The plan created Creditors' Trust and assigned it two types of claims: (1) claims for liabilities owed to the LP Entities' bankruptcy estates (Estate Claims), which the Chapter 11 trustee had previously asserted in the adversary proceedings; and (2) claims previously held by individual LP Entities investors (Investor Claims), which Creditors' Trust asserted for the first time in the third amended complaint.

No. 17-11477

After the Chapter 11 plan was confirmed, the bankruptcy judge lifted the abatement and proceeded to consider the adversary proceedings, including this one. Creditors' Trust then filed its third amended complaint, asserting the following claims:

(A) Estate Claims

- **Count 1:** Actual fraudulent transfer under Texas Business & Commerce Code § 24.005(a)(1) through 11 U.S.C. § 544 (against all Licensees listed on Exhibit 4 of the third amended complaint). Exhibit 4 lists "the annual total commissions received by the Defendant Licensees from 2008 through February[] 2015." Thus, Creditors' Trust claims that the commissions the Licensees received from the LP Entities are fraudulent transfers that can be avoided under the Bankruptcy Code.

- **Count 2:** Constructive fraudulent transfer under Texas Business & Commerce Code § 24.005(a)(2) through 11 U.S.C. § 544 (against all Licensees listed on Exhibit 4).

- **Count 3:** Actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) (against "Certain Licensees" listed on Exhibit 4).

- **Count 4:** Constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) (against "Certain Licensees" listed on Exhibit 4).[3]

- **Count 5:** Preferences under 11 U.S.C. § 547 (against "Certain Licensees" listed on Exhibit 4). Creditors' Trust claims that the

---

[3] We have explained before that fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act and the Bankruptcy Code differ in material ways. *See, e.g., Janvey v. Golf Channel, Inc.*, 834 F.3d 570, 573 (5th Cir. 2016) ("The Supreme Court of Texas's answer interprets the concept of 'value' under TUFTA differently than we have understood 'value' under . . . section 548(c) [of] the Bankruptcy Code."). To the extent that these differences are relevant to our Federal Rule of Civil Procedure 12(b)(6) analysis, we address them below.

No. 17-11477

commissions received by "Certain Licensees" are also avoidable as preferential transfers under the Bankruptcy Code.

- **Count 6:** Recovery of avoided transfers under 11 U.S.C. § 550 (against all Licensees).

- **Count 7:** Breach of contract (against all Licensees). Creditors' Trust later agreed to voluntarily abandon this claim, and it is not at issue on appeal.

- **Count 8:** Equitable subordination of the Licensees' claims against the LP Entities' bankruptcy estates under 11 U.S.C. § 510(c) (against all Licensees).

- **Count 9:** Disallowance of the Licensees' claims against the LP Entities' bankruptcy estates under 11 U.S.C. § 502(d) (against all Licensees).

(B) Investor Claims

- **Count 10:** Negligent misrepresentation (against "Certain Licensees," with a reference to Exhibit 5 of the third amended complaint). Exhibit 5 is a "chart detailing the . . . relationship between Licensees and Investors with regard to sales to specific investors." Creditors' Trust's negligent misrepresentation claims appear to be primarily based on the Licensees' distribution of the LP Entities' offering materials to investors.

- **Count 11:** Breach of the Texas Securities Act (against "Certain Licensees," with a reference to Exhibit 5). Creditors' Trust claims that the fractional interests were "unregistered securities," and "certain Licensees" were "unlicensed brokers engaged in the sale" of these securities.

- **Count 12:** Breach of fiduciary duty (against "Certain Licensees," with a reference to Exhibit 5). Creditors' Trust claims that as

8

No. 17-11477

securities brokers, the Licensees owed the investors a fiduciary duty which they breached by making material misrepresentations.[4]

Many of the Licensees filed or amended previously filed motions to dismiss the third amended complaint. The district court withdrew the reference in the adversary proceeding and referred the motions to the bankruptcy judge. The bankruptcy judge held two hearings on the motions before filing his report and recommendation.

The bankruptcy judge recommended dismissal of the fraudulent transfer claims, the preference claim, the negligent misrepresentation claim, and the breach of fiduciary duty claim. The judge further recommended that the Texas Securities Act claim be dismissed in part on limitations grounds, and that the equitable subordination and disallowance claims be dismissed in part as to Licensees who did not file claims in the LP Entities' bankruptcy cases.[5] As to each claim for which he recommended dismissal, the bankruptcy judge also recommended that Creditors' Trust be granted leave to amend the third amended complaint.

After reviewing the bankruptcy judge's recommendations, the district court issued a memorandum opinion and order dismissing all of Creditors' Trust's claims against the Licensees with prejudice. In contrast to the bankruptcy judge's recommendation, however, the district court declined to permit Creditors' Trust to amend its complaint to correct the pleading defects.

---

[4] Creditors' Trust also asserted a constructive trust claim in the third amended complaint. However, as Creditors' Trust acknowledges, a constructive trust is "a practical mechanism to enforce the substantive Counts" in its complaint—a remedy rather than a substantive claim. Accordingly, we leave the issue of whether that remedy is appropriate in this case for the district court to address at a later procedural stage.

[5] The bankruptcy judge did not recommend dismissal of the avoidance claim, but this claim is derivative of Counts 1–5.

No. 17-11477

Creditors' Trust then filed a motion for reconsideration, urging the court to grant leave to amend the third amended complaint based on an "oral motion" Creditors' Trust made before the bankruptcy judge. Creditors' Trust attached a fourth amended complaint with significantly longer exhibits which it insisted addressed the pleading issues identified in the district court's order. The district court denied the motion.

## II.

Creditors' Trust appeals three determinations by the district court: (1) its grant of the Licensees' motions to dismiss; (2) its denial of leave to amend the third amended complaint; and (3) its denial of the motion for reconsideration.

## A.

We review a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Castro v. Collecto, Inc.*, 634 F.3d 779, 783 (5th Cir. 2011). Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8(a), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleaded claim is plausible if the allegations in the complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Rule 9(b) imposes a heightened pleading standard in cases where the plaintiff alleges fraud or mistake: particularity. Fed. R. Civ. P. 9(b). When the Rule 9(b) pleading standard applies, the complaint must contain factual allegations stating the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d

No. 17-11477

1061, 1068 (5th Cir. 1994) (alteration in original) (citation omitted).  In other words, to properly allege fraud under Rule 9(b), the plaintiff must plead the who, what, when, where, and why as to the fraudulent conduct.  *See id.*

The live pleading in this case is the 48-page third amended complaint, to which Creditors' Trust has attached in support nearly 400 pages of exhibits. *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) ("A written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding.").[6]  The third amended complaint recites a complex set of detailed factual allegations and sets out twelve separate causes of action under which Creditors' Trust insists that it is entitled to relief.  With respect to each of Creditors' Trust's claims, we evaluate *de novo* whether the allegations in the third amended complaint adequately state a claim.

### 1. Counts 1 and 3 – Actual Fraudulent Transfer

Creditors' Trust's first claim relies on the actual fraud provision of the Texas Uniform Fraudulent Transfer Act (TUFTA):

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . , if the debtor made the transfer . . . : (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Tex. Bus. & Com. Code § 24.005(a)(1).  Thus, the elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors.

---

[6] We caution litigants that this rule does not mean they can or should attach lengthy exhibits to their complaints in the hope of making otherwise deficient pleadings sufficient under Rule 12(b)(6).  However, in complex cases such as this one, documents that support a plaintiff's claims and aggregate relevant information can be helpful attachments.

No. 17-11477

*Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Creditors' Trust brings this claim through 11 U.S.C. § 544(b)(1). Count 3 relies on the Bankruptcy Code's actual fraudulent transfer doctrine, set out in 11 U.S.C. § 548:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted[.]

11 U.S.C. § 548(a)(1)(A). As noted above, Creditors' Trust's theory for its fraudulent transfer claims is that the commissions the LP Entities paid the Licensees are avoidable fraudulent transfers.

As an initial matter, Creditors' Trust argues that although Counts 1 and 3 are actual fraudulent transfer claims, the Rule 8(a) pleading standard applies. The bankruptcy judge agreed, relying on Judge Godbey's opinion in *Janvey v. Alguire*, 846 F. Supp. 2d 662 (N.D. Tex. 2011). The district court applied Rule 9(b). Consistent with Judge Godbey's reasoning in *Alguire*, Creditors' Trust emphasizes that its actual fraudulent transfer claims do not require any allegation that the defendant Licensees engaged in fraud; only the fraudulent conduct of the debtor LP Entities is relevant to Counts 1 and 3. *Alguire*, 846 F. Supp. 2d at 676 (holding that there is "no principled reason" to apply Rule 9 to TUFTA actual fraudulent transfer claims because "[t]here is no allegation that the [d]efendant committed any act of fraud" (alterations in original)).

We have not previously addressed the question of whether an actual fraudulent transfer claim is subject to Rule 9(b)'s heightened pleading requirements. *See Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) ("We

need not and do not address the issue of whether heightened pleading is required."). And the district courts in this circuit are not in unanimity on this question. *Compare Guffy v. Brown* (*In re Brown Med. Ctr., Inc.*), 552 B.R. 165, 167 (S.D. Tex. 2016) (applying Rule 9(b)), *with Alguire*, 846 F. Supp. 2d at 675–76. But we observe that at least three other circuits—the First, Second, and Eighth Circuits—have concluded that Rule 9(b) applies. *In re Lawson*, 791 F.3d 214, 217 & n.5 (1st Cir. 2015) (noting that Rule 9 is the appropriate pleading standard for an actual fraudulent transfer claim under the Rhode Island Uniform Fraudulent Transfer Act); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (New York Uniform Fraudulent Conveyance Act); *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 225, 226 & n.6 (8th Cir. 2018) (Minnesota Uniform Fraudulent Transfer Act); *see also Pricaspian Dev. Corp. v. Martucci*, 759 F. App'x 131, 135–36 (3d Cir. 2019) (New Jersey Uniform Fraudulent Transfer Act); *Nw. Nat. Ins. Co. of Milwaukee, Wis. v. Joslyn*, 53 F.3d 331, at *1, 4 (6th Cir. 1995) (unpublished) (Ohio's fraudulent transfer statute); *Nishibun v. Prepress Sols., Inc.*, 111 F.3d 138, at *1 (9th Cir. 1997) (unpublished) (California's fraudulent transfer statute); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1297 (4th ed. 2019 update) ("Claims of fraudulent transfer or fraudulent conveyance are also subject to the heightened standard of Rule 9(b).").

The Fourth, Seventh,[7] Tenth, and Eleventh Circuits have not yet addressed the issue, and the district courts in the Fourth, Tenth, and Eleventh

---

[7] The Seventh Circuit has held that constructive fraudulent transfer claims under the Illinois Uniform Fraudulent Transfer Act are subject to Rule 9(b), *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078–79 (7th Cir. 1997), and district courts in the circuit have applied this holding to actual fraudulent transfer claims as well. *See Desmond v. Taxi Affiliation Servs. LLC*, 344 F. Supp. 3d 915, 923–24, 926 (N.D. Ill. 2018).

No. 17-11477

Circuits, like ours, are divided.[8]  Here, because Creditors' Trust's Count 1 and 3 allegations are sufficient under either standard, we need not weigh in on this vexing question.

First, Creditors' Trust adequately states a claim under Rule 8(a) and *Twombly*.  The third amended complaint identifies the Licensees—listed by name in Exhibit 4—as the creditors to whom the transfers were made and the LP Entities as the debtor-transferors.  The Licensees complain that Creditors' Trust has not specified *which* LP Entity made the transfers, but in cases involving a Ponzi or Ponzi-like scheme, a plaintiff "may establish fraudulent intent by showing that the . . . enterprise operated as a Ponzi scheme" without proving which of the entities involved in the scheme was the transferor. *Alguire*, 846 F. Supp. 2d at 672 (citing *Warfield v. Byron*, 436 F.3d 511, 558 (5th Cir. 2006)); *see id.* at 677.  And it can hardly be argued that the third amended complaint fails to allege an actual intent to defraud on the part of the LP Entities—the complaint is replete with allegations to this effect, including facts corresponding directly to the "badges of fraud" listed in the Texas actual fraudulent transfer statute.  *See* Tex. Bus. & Com. Code § 24.005(b).

If Rule 9(b) is the applicable pleading standard, the Count 1 and 3 allegations satisfy it as well.  Exhibit 4 sets out the details of the allegedly fraudulent transfers—including the transferor, transferees, amounts, and time period—and the complaint itself contains pages of allegations detailing the underlying fraudulent scheme.  *See Alguire*, 846 F. Supp. 2d at 677 (finding

---

[8] Fourth Circuit: *Compare Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co.*, 2016 WL 4703725, at *5 (M.D.N.C. Sept. 8, 2016) (applying Rule 9(b)), *with Bell v. Disner*, 2014 WL 6978690, at *6 (W.D.N.C. Dec. 9, 2014) (applying Rule 8). Tenth Circuit: *Compare Wagner v. Galbreth*, 500 B.R. 42, 53 (D.N.M. 2013) (applying Rule 9(b)), *with Touchstone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1083 (D. Colo. 2012) (applying Rule 8). Eleventh Circuit: *Compare Kipperman v. Onex Corp.*, 2007 WL 2872463, at *6 (N.D. Ga. Sept. 26, 2007) (applying Rule 9(b)), *with Pearlman v. Alexis*, 2009 WL 3161830, at *5 (S.D. Fla. Sept. 25, 2009) (applying Rule 8).

fraudulent transfer allegations sufficient under Rule 9(b) where they included the time period in which the transfers occurred; the details of the underlying Ponzi scheme, including that the defendants received compensation from the Ponzi scheme "in the form of funds derived from unsuspecting investors[]"; and the total amount of compensation each defendant received).

With respect to the timing of the transfers, the Licensees have not demonstrated that any transfers are barred by TUFTA's four-year statute of limitations for the reasons explained in the bankruptcy judge's report and recommendation. *See* Tex. Bus. & Com. Code § 24.010(a)(1). Under the Bankruptcy Code, however, actual fraudulent transfer claims are barred as to transfers made more than two years before the petition date. 11 U.S.C. § 548(a)(1). Exhibit 4 lists transfers occurring as far back as 2008, some of which are plainly untimely under this statute of repose. Accordingly, we affirm the district court's dismissal of Count 3 only as to transfers made by Life Partners Holdings before January 20, 2013, and transfers made by LPI and LPI Financial Services before May 19, 2013. Because we conclude that Count 1 and the remainder of Count 3 are adequately pleaded, we hold that the district court erred in dismissing these claims.

2. Counts 2 and 4 – Constructive Fraudulent Transfer

TUFTA's constructive fraudulent transfer provision, which Creditors' Trust relies on in Count 2 of the third amended complaint, stipulates:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . , if the debtor made the transfer . . . : (2) without receiving a reasonably equivalent value in exchange for the transfer . . . , and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code § 24.005(a)(2). Creditors' Trust also brings this claim through 11 U.S.C. § 544. The elements of a constructive fraudulent transfer under Texas law are the same as actual fraudulent transfer except instead of pleading fraudulent intent, the plaintiff must plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) the transferor was "financially vulnerable" or insolvent at the time of the transaction. *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562, 566 & n.21 (Tex. 2016); Tex. Bus. & Com. Code § 24.006(a). Creditors' Trust's Bankruptcy Code constructive fraudulent transfer claim, labeled Count 4, requires the following:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . ; and
> >
> > (ii)(I) was insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer . . . [.]

11 U.S.C. § 548(a)(1)(B).

As with actual fraudulent transfer claims, we have not addressed the question of whether the Rule 9(b) pleading standard applies to constructive fraudulent transfer claims. District courts in the Fifth Circuit have suggested that constructive fraudulent transfer claims are only subject to Rule 8(a). *See, e.g., Janvey v. Univ. of Miami*, 2013 WL 12361381, at *4–5 (N.D. Tex. July 11, 2013); *E. Poultry Distribs., Inc. v. Yarto Puez*, 2001 WL 34664163, at *2 (N.D. Tex. Dec. 3, 2001). In *Eastern Poultry*, Judge Lynn emphasized that constructive fraudulent transfer allows for "fraudulent transfer without intent

to defraud," citing to the Southern District of New York's reasoning that "fraud has nothing to do with [a] constructive fraudulent transfer claim" because "[t]he transaction is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee." *E. Poultry*, 2001 WL 34664163, at \*2; *In re White Metal Rolling & Stamping Corp.*, 222 B.R. 417, 428–29 (S.D.N.Y. 1998).

While this reasoning has persuasive value, two of our sister circuits have held that constructive fraudulent transfer claims are subject to Rule 9(b). *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078–79 (7th Cir. 1997) (Illinois Uniform Fraudulent Transfer Act); *Stoebner*, 909 F.3d at 225, 226 & n.6 (Minnesota Uniform Fraudulent Transfer Act). No other circuits appear to have directly addressed the issue. *But see In re Sharp*, 403 F.3d at 56 (applying Rule 9(b) only to actual fraudulent transfer claims under the New York Uniform Fraudulent Conveyance Act). Because we conclude that the Count 2 and 4 allegations satisfy both Rule 8(a) and Rule 9(b), we do not need to reach this question.

Creditors' Trust's third amended complaint satisfies Rule 8(a), largely for the same reasons that the Count 1 and 3 allegations are sufficient. On the issue of insolvency, Creditors' Trust has plausibly alleged that the LP Entities were insolvent for much of their existence, explaining that each new purchase of a fractional interest created a liability to the investor that the LP Entities had insufficient funds to cover because they were paying commissions to the Licensees and distributions to insiders. *See Alguire*, 647 F.3d at 597 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'" (quoting *Warfield*, 436 F.3d at 558)). In addition, Creditors' Trust has adequately alleged a lack of reasonably equivalent value because providing services in furtherance of a fraudulent Ponzi-like scheme, as Creditors' Trust alleges the Licensees did,

17

does not confer reasonably equivalent value as a matter of law. *See Warfield*, 436 F.3d at 560.

Even if Counts 2 and 4 are subject to Rule 9(b)'s heightened pleading standard, they are alleged with sufficient particularity to satisfy that standard. *See Gen. Elec. Capital Corp.*, 128 F.3d at 1080 (holding that constructive fraudulent transfer pleadings complied with Rule 9(b) where the complaint alleged that the transferor did not receive reasonably equivalent value and that the transfers "rendered [the transferor] insolvent and effectively precluded" it from paying its debts (internal quotation marks and citation omitted)); *Janvey v. Suarez*, 978 F. Supp. 2d 685, 696, 701 (N.D. Tex. 2013) (applying *Alguire's* reasoning regarding Rule 9(b) equally to a TUFTA constructive fraudulent transfer claim).

Notwithstanding the above, the Licensees contend that Counts 2 and 4 are barred at least in part by the relevant statutes of repose. *Compare* Tex. Bus. & Com. Code § 24.010(a)(2) (TUFTA's four-year state of repose), *with* 11 U.S.C. § 548(a)(1) (Bankruptcy Code's two-year statute of repose). We agree for the reasons explained by the bankruptcy judge. We therefore dismiss Count 2 only as to transfers from Life Partners Holdings that occurred before January 20, 2011, and transfers from LPI and LPI Financial Services that occurred before May 19, 2011. We also dismiss Count 4 only as to transfers from Life Partners Holdings that occurred before January 20, 2013, and transfers from LPI and LPI Financial Services that occurred before May 19, 2013. Because the remainder of Counts 2 and 4 are adequately pleaded under Rule 8(a), the district court erred in dismissing these claims in their entirety.

### 3. Count 5 – Preferential Transfer

The elements of a Bankruptcy Code preference claim are as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—

No. 17-11477

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition . . . ; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). In the third amended complaint, Creditors' Trust clarifies that its preference claim applies only to transfers that were made within 90 days before each of the LP Entities' bankruptcy petitions were filed.

The parties do not dispute that Rule 8(a) applies to Count 5. The third amended complaint's allegations satisfy this standard as to elements 1–4 above. The complaint alleges that the LP Entities transferred commissions to the Licensees (1) for the Licensees' benefit; (2) pursuant to a contractual obligation that the LP Entities owed to the Licensees; (3) while the LP Entities were insolvent, as explained in *supra* Section II.A.2.; and (4) within 90 days before each LP Entity filed its bankruptcy petition. However, the third amended complaint does not plead any facts relevant to element 5: it does not explain what the Licensees would have received in a chapter 7 case, nor does it state whether the commissions were greater than that amount. Accordingly, because Count 5 does not contain allegations on this essential element of a preferential transfer, we hold that the district court properly dismissed this claim as inadequately pleaded. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (explaining that *Twombly* requires allegations on "each element of a claim").

19

No. 17-11477

### 4. Counts 6 and 9 – Avoidance and Disallowance

As the Licensees acknowledge, Creditors' Trust's avoidance and disallowance claims are remedial. Under the Bankruptcy Code, if Creditors' Trust demonstrates that the transfers to the Licensees were fraudulent or preferential, it is entitled to avoid these transfers and recover them on behalf of the bankruptcy estates. *See* 11 U.S.C. §§ 547(b), 548(a)(1), 550(a). In addition, the Licensees' claims against the bankruptcy estates will be disallowed in whole or in part. *See* 11 U.S.C. § 502(d). Thus, these two claims are derivative of and dependent on Creditors' Trust's Count 1–5 allegations. Because Counts 1–4 of the third amended complaint are adequately pleaded, we hold that the district court erred in dismissing derivative Counts 6 and 9.

### 5. Count 8 – Equitable Subordination

Under 11 U.S.C. § 510, "the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim" in bankruptcy. 11 U.S.C. § 510(c). In the Fifth Circuit, equitable subordination is appropriate when (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *Wooley v. Faulkner* (*In re SI Restructuring, Inc.*), 532 F.3d 355, 360 (5th Cir. 2008). "[A] claim should be subordinated only to the extent necessary to offset the harm which the . . . creditors have suffered as a result of the inequitable conduct." *Id.* at 360–61. This court typically only applies equitable subordination in three types of cases: (1) when a fiduciary of the debtor misuses the relationship to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors. *Official*

No. 17-11477

*Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop., Inc.*), 119 F.3d 349, 357 (5th Cir. 1997).

The Licensees insist that the equitable subordination claim is subject to Rule 9(b)'s heightened pleading standard because it is "fraud-based." We disagree for the reason set out by the bankruptcy judge: "[e]quitable subordination claims, by their nature, do not require the establishment of fraud by the defendant." Equitable subordination requires only "inequitable conduct" on the part of the claimant, so Creditors' Trust need only satisfy Rule 8(a) to adequately plead this claim. *See In re SI Restructuring*, 532 F.3d at 360.

While the third amended complaint does contain allegations to address the elements of equitable subordination, the allegations are largely conclusory. For example, the third amended complaint does not allege facts regarding the extent of the harm that any individual investor suffered, stating only that the Licensees' conduct resulted in "the transfer of substantial value" to the Licensees "to the direct detriment" of the investors. The exhibits attached to the third amended complaint do not appear to provide this information either. These types of conclusory recitations fail to state a claim under Rule 8(a). *See Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do[.]"). Moreover, the third amended complaint does not allege that the Licensees were fiduciaries of the debtor LP Entities or that the Licensees controlled the LP Entities, and Creditors' Trust concedes that it has not alleged that the Licensees actually defrauded the investors. Thus, the third amended complaint fails to state an equitable subordination claim, and the district court properly dismissed Count 8.

### 6. Count 10 – Negligent Misrepresentation

Under Texas law, the elements of negligent misrepresentation are:

21

(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

We must first decide which pleading standard applies to Creditors' Trust's negligent misrepresentation claim. "Although Rule 9(b) by its terms does not apply to negligent misrepresentation claims, this court has applied the heightened pleading requirements when the parties have not urged a separate focus on the negligent misrepresentation claims." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)). Because Creditors' Trust has identified a separate focus on its negligent misrepresentation claims, Rule 9(b) does not apply here. In *Williams*, the fraud and negligent misrepresentation claims relied on the same misrepresentations, 112 F.2d at 177, and in *Benchmark*, they were "based on the same set of alleged facts." 343 F.3d at 723. Here, however, Creditors' Trust's negligent misrepresentation claim relies on a different set of misrepresentations—the offering materials— than its fraudulent transfer claims, which rely on the *commissions* paid to the Licensees as the operative fraudulent conduct. The two claims also rely on different sets of underlying facts: for the fraudulent transfer claims, the relevant facts are the payment of commissions to the Licensees; for the negligent misrepresentation claim, the relevant facts are the distribution of the LP offering materials to investors. Count 10 is thus subject only to Rule 8(a). *See Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 & n.30 (5th Cir. 2004) (distinguishing *Williams* and *Benchmark* and

No. 17-11477

finding that "plaintiffs' negligent misrepresentation claims are only subject to the liberal pleading requirements of Rule 8(a)").

The negligent misrepresentation allegations in the third amended complaint satisfy Rule 8(a). Specifically, the complaint explains that (1) the Licensees distributed the offering materials in the course of their employment and had a pecuniary interest through their commissions; (2) the offering materials contained an array of false statements and were provided to the investors; (3) the Licensees distributed the offering materials when they knew or should have known that the fractional interests were bad investments; and (4) the investors justifiably relied by purchasing fractional interests and were harmed "in the minimum amount of the price paid for their investment[s]." We therefore hold that the district court erred in dismissing Count 10 as inadequately pleaded.[9]

### 7. Count 11 – Violation of the Texas Securities Act

The Texas Securities Act provides that:

> A person who offers or sells a security in violation of Section 7, 9 . . . , 12, [or] 23C . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security.

Tex. Rev. Civ. Stat. art. 581-33(A)(1). Section 7 of the Act prohibits the sale of unregistered securities, *id.* art. 581-7, and Section 12 sets out requirements for the registration of a seller of securities, *id.* art. 581-12. Section 9 of the Act requires the disclosure of material facts in an offer of sale for a security. *Id.* art. 581-9(C). Finally, Section 23(C) proscribes false, misleading, or deceptive offers to sell that are prohibited by a cease publication order. *Id.* art. 581-23(C).

---

[9] We agree with the bankruptcy judge's conclusion that this claim is not barred by limitations for the reasons stated in the bankruptcy judge's report and recommendation.

No. 17-11477

The parties agree that Rule 8(a) applies to Count 11.  The allegations on this count do not adequately state a claim.  The third amended complaint does not clearly allege which sections of the Texas Securities Act the Licensees violated.  Presumably, because the third amended complaint states that the Licensees were "unlicensed brokers engaged in the sale of unregistered securities," Creditors' Trust focuses on Sections 7 and 12.  However, because the third amended complaint does not explain which Licensees are the "certain Licensees" who violated the Act, it fails to give those defendants fair notice of the claim against them.  *See Twombly,* 550 U.S. at 555.  In addition, as the district court noted, neither the third amended complaint nor Exhibit 5 contains information indicating which investors still own fractional interests, so it is impossible to determine whether the remedy sought by each investor is rescission or damages.  For these reasons, the district court properly dismissed Creditors' Trust's Texas Securities Act claim.

8. Count 12 – Breach of Fiduciary Duty

The parties disagree as to whether Rule 9(b) applies to this claim.  We have noted in an unpublished case that Rule 9(b) governs breach of fiduciary duty claims that are "predicated on fraud."  *Brown v. Bilek,* 401 F. App'x 889, 893 (5th Cir. 2010); *see also In re Elec. Data Sys. Corp. ERISA Litig.,* 305 F. Supp. 2d 658, 672 (E.D. Tex. 2004) ("Only a breach of fiduciary duty claim which includes a fraud claim implicates Rule 9(b).").  But Creditors' Trust has not pleaded a breach of fiduciary duty claim that is "predicated on fraud."  Instead, the third amended complaint alleges that the Licensees disseminated the misrepresentations in the offering materials *negligently.*  Thus, the breach of fiduciary duty claim does not rely on fraudulent conduct by the Licensees, but instead relies on the Licensees' failure to exercise reasonable care.  Count 12 is therefore not subject to Rule 9(b).

No. 17-11477

A Texas law claim for breach of fiduciary duty requires the plaintiff to plead the following elements: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). Texas courts have found that financial advisors owe their clients a fiduciary duty. *E.g.*, *W. Reserve Life Assurance Co. of Ohio v. Graben*, 233 S.W.3d 360, 374 (Tex. App.— Fort Worth 2007, no pet.). And this court has held that brokers owe their customers a fiduciary duty. *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987). However, as we explained in *Romano*, "the nature of the fiduciary duty owed will vary, depending on the relationship between the broker and the investor." *Id.* Thus, because the duty owed is contingent on the nature of the fiduciary relationship, the plaintiff must plead some facts as to the nature of the relationship to state a plausible claim that that a fiduciary duty has been breached. *See id.* ("[T]he duty to disclose information about risk will vary depending on the circumstances and the nature of the relationship[.]" (quoting *Clayton Brokerage Co. v. Commodity Futures Trading Comm'n*, 794 F.2d 573, 582 (11th Cir. 1986))).

The third amended complaint does not contain any allegations regarding the relationship between any specific Licensee and any specific investor. Importantly, it does not state facts regarding "the degree of trust" placed in the Licensee or "the intelligence and personality" of the investor, so the nature of the fiduciary duty owed cannot be ascertained from the pleadings. *See id.* As a result, the third amended complaint does not provide sufficient facts to allege that any fiduciary duty has been breached by any individual Licensee. Finally, the third amended complaint also limits Count 12 to "certain Licensees," but does not explain which Licensees fall within that group. The district court therefore properly dismissed Creditors' Trust's breach of fiduciary duty claim.

25

No. 17-11477

For the reasons described, we hold that the district court erred in dismissing Counts 1–4, 6, 9, and 10 as inadequately pleaded.[10]  However, we affirm the district court's dismissal of Counts 5, 8, 11, and 12 under Rule 12(b)(6).

## B.

Even if a plaintiff's pleadings are deficient under Rule 12(b)(6), a district court should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In fact, "Rule 15(a) 'evinces a bias in favor of granting leave to amend.'"  *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016) (quoting *Hermann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 566 (5th Cir. 2002)).  "[P]ermissible reasons for denying a motion for leave to amend include 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , futility of amendment, etc.'"  *Id.* at 591 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Leave to amend need not be granted when the amended pleading "would not withstand a motion to dismiss for failure to state a claim."  *Lewis v. Fresne*, 252 F.3d 352, 360 n.7 (5th Cir. 2001).  We review the denial of a motion for leave to amend for an abuse of discretion.  *Thomas*, 832 F.3d at 590.  However, where the denial of leave to amend was based solely on futility, we apply a *de novo* standard of review instead.  *Id.*

In its order of dismissal, the district court emphasized that Creditors' Trust had not sought leave to amend before the district court issued its final judgment.  Creditors' Trust contends that it did indeed request leave to amend. It explains the relevant procedural context as follows: At the first hearing before the bankruptcy judge, the Licensees "repeatedly correlated the[ir Rule

---

[10] On remand, Creditors' Trust may still wish to replead these claims for clarity.

No. 17-11477

12(b)(6)] challenges with the manner in which the Creditors' Trust had utilized 'Exhibit 4' to the Third Amended Complaint to aggregate pertinent information[.]"   In response to these specific complaints about the third amended complaint, Creditors' Trust made the following statements:

> If the Court . . . says that we need to have an Exhibit [4][11] that runs for thousands of pages and has every payment and every date of payment, that's within our ability and we would certainly appreciate leave to do so if the Court feels that our pleadings need to go that far.
>       . . . Well, here, I'm advising the Court that . . . it would not be futile to ask us to expand Exhibit [4]. We can certainly do that.
>       . . . [W]e believe that Exhibit [4] was reasonable under the circumstances, and if the Court disagrees, we would ask for leave to fix it.

Creditors' Trust characterizes these statements as a sufficient motion for leave to amend the third amended complaint.  We agree.

A party requesting leave to amend its pleadings must "give the court some notice of the nature of his or her proposed amendments." *Thomas*, 832 F.3d at 590.   The party requesting amendment must describe with particularity the grounds for the amendment and the relief sought, but a "formal motion" is not required. *Id.* For his part, the bankruptcy judge appears to have found that Creditors' Trust's oral statement properly requested leave because he recommended that the district court permit repleading. And given the informal nature of bankruptcy court proceedings, it is not unusual that Creditors' Trust did not follow its oral request up with a written motion.[12]

---

[11] The hearings before the bankruptcy judge were joint hearings in all five adversary proceedings.  In the live pleadings in three of those cases, Nos. 17-11480, 18-10051, and 18-10056, the equivalent of Exhibit 4 here was instead labeled Exhibit 5.  Thus, the parties' references to Exhibit 5 at the hearing encompass Exhibit 4 in this case as well.

[12] Although Creditors' Trust's briefs do not address it, Creditors' Trust did make a written request to amend in the district court before final judgment.  In its response to the Licensees' objections to the bankruptcy judge's report and recommendation, Creditors' Trust

No. 17-11477

Because the oral statement gave the court notice of the nature of the amendment—expanding Exhibit 4—and the grounds—repleading would not be futile because Creditors' Trust had the ability to provide further detail about the transfers to the Licensees—we hold that Creditors' Trust properly moved for leave to amend before final judgment.

The district court's dismissal order explained that it was declining to permit leave to amend because the Licensees' motions to dismiss alerted Creditors' Trust to the deficiencies in its pleadings; Creditors' Trust did not indicate in its response to the motions that it could replead to correct the pleading issues; and due to the number of complaint amendments it had already made, Creditors' Trust had "had a fair opportunity to make [its] case." While it is true that the Licensees' motions identified many of the pleading issues that the district court relied upon, Creditors' Trust had a good-faith basis for believing that its pleadings were sufficient: it used the same pleading methodology in its case against Pardo and the LP insiders, and the district court there denied Rule 12(b)(6) challenges similar to those made in this case. *See Moran*, No. 4:15-CV-905, Dkt. No. 192. Moreover, Creditors' Trust attempted to address the alleged pleading defects in its second and third amended complaints, both of which it filed well before the bankruptcy judge issued his report and recommendation—the first time a court found that its pleadings were deficient. In addition, Creditors' Trust's third complaint amendment was made in response to the confirmation of the Chapter 11 plan in the underlying bankruptcy case, which broadened the nature of the claims that Creditors' Trust could assert.

---

asked the district court to accept the recommendation to grant leave to amend and offered to file "more detailed charts." The district court acknowledged this request in a footnote in its order on the motions to dismiss.

28

Considering the above facts and circumstances, we conclude that the Licensees have not demonstrated undue delay, bad faith, or dilatory motive on the part of Creditors' Trust, nor have they convinced the court that permitting Creditors' Trust to replead would be unduly prejudicial. It was therefore an abuse of discretion for the district court to deny leave to amend for any of these reasons. *See Brown v. Taylor*, 911 F.3d 235, 247 (5th Cir. 2018) (district court abused its discretion in denying leave to amend where plaintiff explained why he believed his first amended complaint was sufficient, offered a proposed amendment, and had not repeatedly failed to cure deficiencies). The only proper ground on which the district court could have declined to grant leave to amend was futility. Accordingly, we will evaluate whether repleading each of Creditors' Trust's claims would be futile based on its oral motion for leave to amend. *See Thomas*, 832 F.3d at 592 (evaluating futility based on specific amendments plaintiff requested).

The pleading defects that the district court and bankruptcy judge identified with Counts 1–4 resulted largely from the unique pleading methodology used in the third amended complaint. Specifically, Creditors' Trust relies on Exhibit 4 to set out the details of the transfers it wishes to avoid as either fraudulent or preferential transfers. Exhibit 4, in turn, lists the Licensees' names and the sum of the transfers allegedly received by each Licensee annually from 2008 to 2015. Exhibit 4 does not, however, identify the transferor entity for each transfer, the amount of any particular transfer, or the specific date on which any transfer was made. As we explained in Section II.A., this information is not required to adequately state a claim on Counts 1–4, but the district court expressly relied on these omissions to dismiss these counts.

The substance of Creditors' Trust's oral request to replead at the first bankruptcy hearing reveals that it possesses the kind of detailed information

about the alleged fraudulent transfers—dates, amounts, etc.—that the district court held was necessary to adequately state a claim. And the specific amendment to the third amended complaint that Creditors' Trust suggested—expanding Exhibit 4—would include this information in the next iteration of the complaint. Thus, even if the district court correctly dismissed Counts 1–4 on these grounds, repleading to add specificity regarding the allegedly fraudulent transfers would not have been futile.[13] Accordingly, the district court erred in declining to grant leave to amend the allegations on Counts 1–4. And because Counts 6 and 9 are derivative of Counts 1–4, the district court improperly denied leave to amend those claims as well.

Turning to Count 5, while expanding Exhibit 4 as Creditors' Trust requested would provide additional information relevant to this claim, it would not address the third amended complaint's failure to plead element 5 of a preferential transfer: that the Licensees' commissions were greater than the amount they would have received through a chapter 7 bankruptcy. *See Lormand*, 565 F.3d at 257. Therefore, granting leave to amend as to Count 5 would have been futile.

As for the other claims that Creditors' Trust asserted in the third amended complaint—Count 8, equitable subordination; Count 10, negligent misrepresentation; Count 11, violations of the Texas Securities Act; and Count 12, breach of fiduciary duty—Exhibit 4 does not contain information relevant to these causes of action. In fact, Counts 10–12 expressly rely on a different complaint exhibit, Exhibit 5, to aggregate the pertinent details. As a result,

---

[13] The proposed fourth amended complaint that Creditors' Trust submitted with its motion for reconsideration confirms that expanding Exhibit 4 would not be futile. The expanded Exhibit 4 attached to that complaint—now re-labeled as Exhibit 1—lists each allegedly fraudulent or preferential transfer in meticulous detail, setting out the date, amount, transferor, transferee, and purpose, as well as the creditors it alleges were defrauded as a result of that transfer. This amendment cures any pleading defects in Counts 1–4.

expanding Exhibit 4 would not address the pleading deficiencies in Counts 8, 11, and 12 that we described in the previous section, nor would it address the pleading defects the district court identified in Count 10. Because this is the only complaint amendment that Creditors' Trust suggested in its oral motion for leave to amend, granting the motion would have been futile as to these claims. Thus, the district court did not err in declining to permit Creditors' Trust to replead Counts 8, 10, 11, and 12.

## C.

This court reviews the denial of a motion for reconsideration for an abuse of discretion. *See ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 847 (5th Cir. 2006). Under this standard, the district court's decision need only be reasonable. *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 353 (5th Cir. 1993). This court construes a motion for reconsideration filed within 28 days of final judgment as a Federal Rule of Civil Procedure 59(e) motion to alter or amend the district court's judgment. *Mason v. Fremont Inv. & Loan*, 671 F. App'x 880, 884 (5th Cir. 2016); *see also Williams v. Thaler*, 602 F.3d 291, 303 & n.7 (5th Cir. 2010). "A motion to alter or amend the judgment under Rule 59(e) must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (internal quotation marks omitted) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003)).

Because we conclude that Counts 1–4, 6, and 9 were adequately pleaded—or, in the alternative, that the district court should have granted leave to amend—we need not reach the question of whether the district court also erred in denying Creditors' Trust's motion for reconsideration with respect to those counts. The same can be said for Count 10, which we also conclude

was adequately pleaded in the third amended complaint. As for Creditors' Trust's remaining claims—Counts 5, 8, 11, and 12—the district court properly dismissed them both because they were inadequately pleaded and because Creditors' Trust's proposed amendment was futile as to these claims. We next consider whether the district court nevertheless abused its discretion in denying Creditors' Trust's motion for reconsideration on these counts.

Assuming *arguendo* that Creditors' Trust's Rule 59(e) motion was timely filed,[14] we conclude that the district court did not abuse its discretion. As we explain more fully below, the proposed fourth amended complaint attached to the motion abandons Count 5 and still fails to state a claim on Counts 8 and 12, so Creditors' Trust has not demonstrated that the district court made a "manifest error of law" in dismissing those claims. *See Schiller*, 342 F.3d at 567. And although the fourth amended complaint's allegations on Count 11 are likely sufficient, Creditors' Trust "could, and should" have requested leave

---

[14] The Licensees argue that the motion for reconsideration was untimely. According to the Licensees, the 14-day deadline for filing post-judgment motions in Federal Rule of Bankruptcy Procedure 9023 governs the motion, not the 28-day deadline in Rule 59. Because Creditors' Trust filed its motion 28 days after judgment was entered, it failed to file within the bankruptcy deadline. Creditors' Trust responds that the 14-day deadline in Bankruptcy Rule 9023 "applies solely to the transition of jurisdiction from a bankruptcy court to an Article III court." Where, as here, a district court has withdrawn the bankruptcy reference, Creditors' Trust argues that the Bankruptcy Rules are a "procedural nullity." Although it did not state the reasons for its conclusion in its order on the motion for reconsideration, the district court agreed with Creditors' Trust that the motion was not untimely.

At best, whether the motion for reconsideration was untimely filed is unclear. In *In re Butler*, this court found that Bankruptcy Rule 9023 does not apply to appeals from the district court to the court of appeals. *Butler v. Merchants Bank & Tr. Co.* (*In re Butler, Inc.*), 2 F.3d 154, 155 (5th Cir. 1993). Instead, Bankruptcy Rule 8015 "provides the sole mechanism for filing a motion for rehearing" in the district court, and Rule 8015 sets a 10-day deadline for doing so. *Id.* (quoting *Aycock v. Eaton* (*In re Eichelberger*), 943 F.2d 536, 538 (5th Cir. 1991)); Fed. R. Bankr. P. 8015. Thus, if *Butler* requires the court to construe the motion for reconsideration as a motion for rehearing, it was untimely. *See id.* But this court has not addressed which rule—Rule 59, Bankruptcy Rule 8015, or Bankruptcy Rule 9023—governs when a district court withdraws the bankruptcy reference in an adversary proceeding, and we need not do so today.

to amend its pleadings on that claim "before the judgment issued." *Id.* We will address each of these claims in turn.

### 1. Count 5 – Preferential Transfer

Creditors' Trust's proposed fourth amended complaint abandons this claim. The district court accordingly did not abuse its discretion in denying the motion to reconsider as to Count 5.

### 2. Count 8 – Equitable Subordination

The fourth amended complaint's allegations on the equitable subordination claim largely duplicate the third amended complaint's allegations on that claim. Significantly, the fourth amended complaint still fails to plead into one of the three categories of cases in which we permit equitable subordination. *See In re Cajun Elec.*, 119 F.3d at 357. Accordingly, permitting Creditors' Trust to replead Count 8 would have been futile as well.

### 3. Count 11 – Violation of the Texas Securities Act

The fourth amended complaint states a claim under Section 33(A)(1) of the Texas Securities Act, adequately alleging violations of Sections 7 and 12. *See* Tex. Rev. Civ. Stat. art. 581-33(A)(1), 581-7, 581-12. The fourth amended complaint remedies the pleading defects in Count 11 in the third amended complaint: specifically, it alleges that each of the Licensees—identified by name in Exhibit 4 to the fourth amended complaint—was an unlicensed seller of securities and that Creditors' Trust seeks to recover damages on behalf of the investors listed by name in Exhibit 4 in the amount of the purchase price of their investments. *See Matlock v. Hill*, 2016 WL 3659988, at *5 (Tex. App.—Amarillo June 30, 2016, no pet.) ("[Seller's] lack of a license coupled with his selling of . . . a security in the guise of a life settlement evinced a violation of art. 581-12(A) of the [Texas Securities Act].").

Nonetheless, we hold that the district court did not abuse its discretion in denying Creditors' Trust motion for reconsideration on this claim. Because

Creditors' Trust's request for leave to amend focused exclusively on expanding Exhibit 4 to the third amended complaint, the first time Creditors' Trust sought to amend its Count 11 allegations was in its motion for reconsideration after the district court's judgment of dismissal. *See Williams v. McWilliams*, 20 F.3d 465, 465 (5th Cir. 1994) (finding no abuse of discretion in denial of leave to amend when plaintiff first requested leave in a motion to reconsider after final judgment). And that motion did not point to any "newly discovered evidence," nor did it explain why the district court should consider Creditors' Trust's "arguments which could, and should, have been made before the judgment issued." *See Schiller*, 342 F.3d at 567; *Briddle v. Scott*, 63 F.3d 364, 379 (5th Cir. 1995) ("[W]e have consistently upheld the denial of leave to amend where the party seeking to amend has not clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling."). The district court's decision on this claim was reasonable.

### 4. Count 12 – Breach of Fiduciary Duty

On Count 12, the fourth amended complaint does not remedy the third amended complaint's failure to allege facts regarding the nature of the relationship between any Licensee and any investor. Creditors' Trust still does not plead the type of information required under *Romano*. *See* 834 F.2d at 530. As a result, the fourth amended complaint does not adequately allege that any Licensee breached a fiduciary duty. The district court therefore properly denied Creditors' Trust's motion for reconsideration as to Count 12.

### III.

We AFFIRM the district court's judgment of dismissal as to Counts 5, 8, 11, and 12. However, we REVERSE the dismissal of Counts 1–4, 6, 9, and 10 and REMAND them for further proceedings consistent with this opinion.