# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 20, 2016

Lyle W. Cayce
Clerk

No. 15-41435

ALBERT P. MALVINO, representative of the estate of Bonnie Pereida, deceased,

> Plaintiff - Appellee

v.

PAUL A. DELLUNIVERSITA; PCA COLLECTIBLES, INCORPORATED; PCI COIN GRADING, INCORPORATED; TONY JOHN DELLUNIVERSITA,

> Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before KING, SMITH, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

As she approached retirement, Bonnie Pereida spent hundreds of thousands of dollars on rare coins. She thought the coins would be a good hedge against inflation. After she passed away, an appraisal revealed that her coin collection included a counterfeit coin, damaged coins, and coins worth far less than expected. It turned out that the majority owner of the company that sold her the coins also owned the company that acted as a purportedly independent grader of the coins, and the grades it had assigned did not reflect the coins' value.

No. 15-41435

The executor of Pereida's estate sued and obtained a $1,610,802 judgment on claims brought under the Racketeer Influenced and Corrupt Organizations Act (RICO). This appeal requires us to decide two questions: 1) did the RICO claim survive Pereida's death?; and 2) did the evidence establish the pattern of criminal conduct that RICO requires?

Although we conclude that Pereida's RICO claims survived, Malvino did not prove a pattern of racketeering activity at trial. We therefore reverse the judgment and remand for further proceedings as to state law claims on which the district court did not enter judgment.

**I**

During the first five months of 2011, Pereida made 31 purchases from PCA Collectibles, Inc. acquiring 135 coins for $727,569. Pereida was not an expert in numismatics, the study or collection of rare and valuable coins. Coins are valued according to rarity and condition. Rarity is based on "mintage," the number of coins originally minted, as well as the number that have survived. The same rare coin's value can vary wildly based on condition. So collectors have adopted a grading scale. They use descriptors such as "MS" for "mint state" (meaning original condition), or "AU" for "about uncirculated" (meaning very little wear from use). A numeric scale running from one to seventy makes finer distinctions. A coin graded AU50 is slightly more damaged than a coin graded AU55. An MS70 is in perfect condition. Collectors, especially unsophisticated collectors, rely on these grades to determine coins' value. Numismatics is unregulated, however, and whether a grade actually reflects a coin's value depends on whether the grade was assigned consistent with industry standards.

PCA is a rare coins dealer owned by Anthony Delluniversita and his son, Paul Delluniversita. Paul, who owns 40% of PCA, serves as its president, but in practice his sole job is ensuring that sales representatives are on the phone

2

No. 15-41435

making sales; Anthony, who owns 60%, manages all other operations, including training salespeople and setting coin prices.

Each coin PCA sold Pereida came with an invoice that showed the grade as determined by "independent third party" grader PCI Coin Grading, Inc. Anthony, however, owned and operated PCI, which he had purchased in November 2010. He was also PCI's sole coin grader, although he had no formal training in numismatics. For each coin PCA sold to Pereida, Anthony had purchased it, through PCA, in a "raw," or ungraded, state and personally assigned it a PCI grade. Just over a year after he purchased the company, Anthony sold PCI in late 2011.

Pereida passed away in October 2011. Her former fiancé, Albert Malvino, became executor of her estate. Malvino had the coin collection appraised for tax purposes by Heritage Auction Appraisal Services, a leading coin valuation company. Heritage determined that the fair market value of the PCA coins was only $190,865, or 26.2% of the amount Pereida paid. Heritage found that PCI overgraded coins, failed to identify a counterfeit coin, and improperly graded "cleaned"[1] coins. Malvino then retained Paul Montgomery, an experienced coin grader, for a second opinion. Montgomery found the collection was worth $150,964 at the time of purchase, or 20.8% of what Pereida paid. Like Heritage, he found patterns of overgrading and selective overgrading to take advantage of significant changes in valuation for small grade variances.[2] Montgomery graded all of Pereida's coins lower than

---

[1] "Cleaning" is a technical term and describes the chemical treatment of a coin's surface to improve its appearance and desirability. The process can severely damage a coin and is not an accepted technique to enhance the grade of a coin.

[2] For example, a 1911-D $5 Gold Indian Head coin graded at MS63 is generally valued at $40,000 while the same coin graded at MS60 is generally valued at $6,750. In selective overgrading, dealers identify coins with such dramatic value spreads and overgrade to overcharge buyers.

3

## No. 15-41435

PCI did.  Like Heritage, he identified a counterfeit coin and twenty five coins that were ungradable because they were cleaned or damaged.  Montgomery sought another opinion from the Professional Coin Grading Service, which confirmed his conclusion (and that of Heritage) that the coins were worth about half a million dollars less than what Pereida paid.

Malvino filed suit against Anthony and Paul, PCA, and PCI, asserting a substantive civil RICO violation predicated on mail fraud and wire fraud; conspiracy to violate RICO; various state common law claims including fraud, fraudulent concealment, and negligent misrepresentation; civil conspiracy to commit the state common law violations; and violations of the Texas Deceptive Trade Practices Act.

After a bench trial, the district court dismissed the Texas Deceptive Trade Practices Act claims on the ground that they did not survive Pereida's death.  The court ruled in Malvino's favor, however, on the fraud, negligent misrepresentation, and civil conspiracy claims asserted against PCA and PCI, and held Anthony personally responsible for damages associated with the claims.[3]  For these common law claims, the court found economic damages of $536,934 and exemplary damages in the same amount.

The court also found Anthony and PCA liable under both the substantive and conspiracy provisions of civil RICO.  It held that these claims survived Pereida's death, reasoning that RICO is primarily a remedial statute.  Under RICO's treble damages provision, the court calculated damages in the amount of $1,610,802.[4]  It also noted that RICO allows a prevailing plaintiff to recover attorneys' fees, which totaled $280,190.

---

[3] The district court found that Paul was not individually liable on any claim and entered a judgment in his favor.

[4] This amount represents three times the difference in the price Pereida paid for the coins and the Heritage appraised value.

4

No. 15-41435

Although it calculated damages for the common law claims and the federal statutory ones, the district court concluded that Texas's one satisfaction rule did not allow for recovery under both. It therefore asked Malvino to elect between the two. Malvino sought to recover the RICO damages against Anthony and PCA, and damages for the common law claims against PCI, but the district court found this would impermissibly allow a double recovery. It thus entered judgment only on the RICO claims, against Anthony and PCA.

Defendants moved for a new trial, contending, among other things, that Malvino did not prove they had "engaged in illegal activity over a sufficient period of time to be considered 'racketeering activity' for purposes of RICO." The district court denied that motion, and the Defendants appealed.[5]

## II

Defendants first argue that a RICO claim does not survive the victim's death. We have characterized survivability as an issue of standing. *See Matter of Wood*, 643 F.2d 188, 190 (5th Cir. 1980) (stating that a trustee would have "standing" to press a decedent's claim under the Truth in Lending Act's civil liability provisions only if the claim survived the plaintiff's death). Standing comes in many different forms. *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 594–95 (5th Cir. 2016). If survivability involves the constitutional variety of standing, then it goes to our jurisdiction and must be addressed first. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016).

Survivability does not, however, appear to be a question of Article III standing. Article III requires that a plaintiff must have suffered a concrete injury in fact. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). The

---

[5] Although all the Defendants joined the notice of appeal, judgment was entered only against Anthony and PCA so they appear to be the only ones with a stake in this appeal.

RICO violation caused such an injury to Pereida to the tune of more than $500,000. As a result, it also caused the same economic injury to her estate. Absent the alleged fraud, her estate would have more money. The existence of constitutional injury is reflected by longstanding federal statutes which provide that causes of action survive the death of a party, thus extending the right to sue to representatives of a party's estate. *See* 7C CHARLES ALAN WRIGHT, ET AL., FED. PRAC. & PROC. CIV. § 1954, § 1954 n.11 (3d ed. 2007) (citing, as an example, the Federal Employers' Liability Act). No court has questioned Congress's authority to extend the right to sue in this way, which it could not do if the estate otherwise lacked constitutional injury. *Spokeo, Inc.*, 136 S. Ct. at 1547–48.

Whether the RICO claim survives the injured party's death is thus more accurately viewed as a question of statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387, 1387 n.4 (2014) (noting that statutory standing turns on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim"). Although RICO's survivability therefore goes to whether Malvino has a cause of action, as opposed to whether the court has jurisdiction, *id.*, statutory standing is often treated as a threshold issue. *See United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 612–16 (7th Cir. 2015) (finding, as a "threshold issue[ ]," that plaintiffs had statutory standing to sue under the Terrorism Risk Insurance Act before finding they failed to prove a claim under the Act); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171–78 (3d Cir. 2015) (addressing statutory standing under the Clayton Act as a nonjurisdictional "threshold issue"). It makes sense to treat it that way here.

The general rule for the survivability of federal statutes is that penal statutes do not survive, whereas remedial statutes do. *In re Wood*, 643 F.2d at 190 (citing *Ex parte Schreiber*, 110 U.S. 76, 80 (1884)). The idea that "any

obligation which is penal dies with the person; but that an obligation to restore something does not" has existed in English law since at least the thirteenth century. 3 W. S. HOLDSWORTH, A HISTORY OF ENGLISH LAW, at 577 (5th ed. 1966) (citing thirteenth century English jurist Henry de Bracton). Over time, this notion of remedial laws that survive a person's death has expanded from contract, to real property, to a wide variety of laws. *Id.* at 576–585; 7C FED. PRAC. & PROC. CIV. § 1954. The reason for the different treatment of remedial and penal laws is unclear. *See* Note, *Survival of Actions Brought Under Federal Statutes*, 63 COLUM. L. REV. 290, 290–91 (1963). One possible explanation is that, when the rule developed, the administrator of an estate was obligated to make restitution for the decedent's wrongs for the good of the decedent's soul, and ecclesiastical courts oversaw the administration of estates, providing relief not available in common law courts, so there was no need to enforce penal law against estates in common law courts. HOLDSWORTH, A HISTORY OF ENGLISH LAW, at 582–83. This does not explain why an estate would not have a *right* to sue under penal statutes, and, in fact, estates' rights to sue expanded more quickly than their liabilities to suit. *Id.* at 583–85. Eventually, however, those rights and liabilities became essentially coextensive. *See id.*; 7C FED. PRAC. & PROC. CIV. § 1954. And "the federal law of survival has clung to its common law antecedents." Note, *Survival of Actions Brought Under Federal Statutes*, at 291.

Whether a statute is penal or remedial turns on "whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual." *In re Wood*, 643 F.2d at 191 (quoting *Huntington v. Attrill*, 146 U.S. 657, 668 (1892)). Factors to consider include: "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly

7

disproportionate to the harm suffered." *Id.* (quoting *Murphy v. Household Fin. Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)).

Focusing on the last inquiry, Defendants argue that the availability of treble damages under RICO demonstrates the statute is punitive. But a number of statutes that provide remedies beyond actual damages have been held to be remedial and thus survive. In *Wood*, we recognized that the Truth in Lending Act, by affording a debtor statutory damages of twice the amount of an unauthorized charge even without a showing of actual damages, "effectively imposes a penalty on the creditor." *Id.* at 190. "That a penalty [was] imposed, however, [did] not end our inquiry." *Id.* Instead, recognizing that the statute's liability did not "fall neatly within the common law categories of either a penalty or a remedial action," we considered the primary purpose of the statute and, finding it remedial, concluded that the cause of action survived. *Id.* at 192 (quoting *Porter v. Household Finance Corp.*, 385 F. Supp. 336, 342 (S.D. Ohio, 1974)). We noted that both the antitrust and patent laws authorize recoveries "substantially in excess of 'actual' damages but [ ] have been held not to be penalties (and thus to survive)." *Id.* at 193 n.12.

Likewise, the availability of treble damages under RICO does not prevent it from being classified as a remedial statute. The Supreme Court has "repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature." *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003) (determining that civil RICO claims should be sent to arbitration although arbitration clauses in the parties' agreements prohibited awards of "punitive damages"); *see also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 240 (1987) (explaining that RICO's legislative history emphasizes "the remedial role of the treble-damages provision" and shows that other purposes of RICO damages are "secondary"). RICO is "designed *to remedy* economic injury by providing for the recovery of treble damages."

*PacifiCare*, 538 U.S. at 406 (quoting *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 151 (1987)).    Treble damages, which unlike traditional punitive damages are derived from actual damages, ensure the plaintiff is adequately compensated "by counter-balancing the difficulty of maintaining a private suit." *See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977)); *see also Cook Cty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 131 (2003) (noting that, under the False Claims Act, multiple damages "provide elements of make-whole recovery beyond mere recoupment of the fraud").    Consistent with this remedial purpose, RICO damages are awarded to the harmed individual rather than the public.

Even before these strong pronouncements in *PacifiCare*, the Fourth Circuit concluded that civil RICO survives a plaintiff's death.  *Faircloth v. Finesod*, 938 F.2d 513 (4th Cir. 1991).[6]    Recognizing that "civil RICO is a square peg, and squeeze it as we may, it will never comfortably fit in the round holes of the remedy/penalty dichotomy," it found a claim under the statute survived the death of the injured party because Congress "explicitly declared the purpose of RICO to be 'remedial' and directed that it be 'liberally construed' to effect this purpose."  *Id.* at 518 (quoting Pub. Law No. 91–452, tit. IX § 904(a), 84 Stat. 947, *reprinted* 18 U.S.C. foll. § 1961).

Defendants argue that our recent decision in *Gil Ramirez Group v. Houston Independent School District*, 786 F.3d 400 (5th Cir. 2015), rejects treating RICO as remedial.  *Gil Ramirez* notes what the Fourth Circuit had

---

[6] District courts have split on the question of RICO's survivability. *Compare Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1031 (N.D. Ill. 2007) (finding RICO penal and collecting cases), *with Cty. of Oakland by Kuhn v. City of Detroit*, 784 F. Supp. 1275, 1285 (E.D. Mich. 1992) (finding RICO remedial and collecting cases).  Notably, however, most district courts that found the statute to be penal did so before *Pacificare*.  *But see Hoffman*, 478 F. Supp. 2d at 1031 (finding RICO penal after *Pacificare*, without citing that decision).

recognized in *Faircloth*: that RICO serves both compensatory and punitive purposes. *Id.* at 412–13. As between the two, it acknowledges the Supreme Court's view that RICO's treble damages provision is primarily remedial. *Id.* at 413 (quoting *Pacificare*, 538 U.S. at 406). But that did not resolve the question in *Gil Ramirez*, which was whether RICO damages could be awarded against municipal entities. *Id.* at 405–13. We concluded that municipal entities are immune from damages that are *at all* punitive. *Id.* at 412–13. The dual nature of RICO damages therefore prevented any recovery against municipal entities in *Gil Ramirez.* But in deciding the survivability question which turns on the primary nature of the statute, we follow the Supreme Court's guidance that RICO's remedial purpose predominates and hold that a claim under the statute survives the victim's death.

### III

Malvino was thus able to pursue a RICO claim on behalf of Pereida's estate at trial. Defendants argue that he did not successfully do so because there was insufficient proof of an essential element of RICO—that the defendant engaged in a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c); *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009).

Malvino contends that the Defendants waived this challenge to the "pattern" element by raising it for the first time in their motion for a new trial. It should have been raised, he argues, in a motion for summary judgment so he would have known that this was a contested issue. The argument says a lot about modern civil litigation in which summary judgment, rather than trial, has become the focus. But when a case does go to trial, the burden is on the plaintiff to prove every element. That bedrock principle does not depend on whether the defendant filed a pretrial motion challenging the evidence to support a claim. Nor does the ability to seek appellate review of the sufficiency of the evidence at trial. *Colonial Penn Ins. v. Mkt. Planners Ins. Agency Inc.*,

No. 15-41435

157 F.3d 1032, 1036 (5th Cir. 1998) ("We see no reason why [a defendant], following a bench trial, cannot argue now for the first time that the court's findings were clearly erroneous or that they cannot support the judgment."). We thus can consider whether the district court clearly erred in concluding that Malvino proved a pattern of racketeering activity.

To establish that pattern, a plaintiff must show both a relationship between the predicate offenses—here mail fraud and wire fraud—and the threat of continuing activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). These requirements keep civil RICO focused on the long term criminal conduct Congress intended it to address, *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985), and "prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law," *Tabas v. Tabas*, 47 F.3d 1280, 1310 (3d Cir. 1995) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)).

Defendants challenge only the "threat of continuing activity," or "continuity," element. There are two ways to demonstrate continuity: (1) a "closed period of repeated conduct;" or (2) an open-ended period of conduct that "by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. The district court found that there was a "pattern of racketeering activity because [Anthony and PCA] committed mail and wire fraud against Pereida on at least 31 separate occasions . . . ."

Because of the brief time frame during which those sales to one individual occurred, they do not support a finding of closed-ended continuity. A closed period of repeated conduct requires predicate acts that extend over a "substantial period of time." *Id.* at 242. "Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." *Id.* We have found seven months of activity insufficient. *Tel-phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992); *contrast United States v. Bustamante*, 45 F.3d

11

933, 941–42 (5th Cir. 1995) (racketeering acts extending nearly four years suffice). This is consistent with decisions in other circuits. *See Wisdom v. First Midwest Bank*, 167 F.3d 402, 407 (8th Cir. 1999) (holding that ten month period was too short to establish closed-ended continuity); *Tabas*, 47 F.3d at 1293 ("[C]onduct lasting no more than twelve months [does] not meet the standard for closed-ended continuity."); *Religious Technology Ctr. v. Wollersheim*, 971 F.2d 364, 366–67 (9th Cir. 1992) (concluding that a pattern of activity lasting only a few months does not reflect long term criminal conduct to which RICO was intended to apply). Despite the numerous acts of mail and wire fraud that occurred from the sale of coins to Pereida between January and May 2011, that five month period was too short a period to establish closed-ended continuity. *See Tel-phonic Services, Inc.*, 975 F.2d at 1140.

Apparently recognizing that five months is too short, Malvino now contends the pattern of racketeering activity began when PCA opened in 2006 and included sales of "overgraded and artificially overpriced coins to customers 'nationwide.'" But the portions of the record Malvino cites for this evidence are pretrial filings, such as the Defendants' brief in support of their unsuccessful motion to transfer venue to New York which stated that PCA "participate[d] in many transactions nationwide." Those pretrial filings are not trial evidence. *Guillen v. Holder*, 397 F. App'x 30, 32 (5th Cir. 2010) ("[S]tatements in [a] motion and subsequent briefs are not evidence."); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 357 (5th Cir. 2003) (noting that, in assessing sufficiency of the evidence, this court considers "the entire trial record"); *Triple H Debris Removal, Inc. v. Companion Prop. & Cas. Ins. Co.*, 647 F.3d 780, 785 (8th Cir. 2011) ("[O]nce a trial has taken place, the focus is on the evidence actually admitted at trial and not on the earlier pretrial filings."); *Zilkha Energy Co. v. Leighton*, 999 F.2d 548 (10th Cir. 1993) ("[A] court must determine factual issues . . . based on testimony and evidence actually introduced at trial, not on

[previously submitted documents].").  No evidence at trial showed that the fraudulent practices extended to victims other than Pereida or even mentioned the names of other purchasers.  Because all of the evidence of fraudulent practices related to Pereida's purchases, which took place in a five-month period, the evidence was not sufficient to support a finding of closed-ended continuity.

The evidence also does not support a finding of open-ended continuity, the less common way to establish a pattern.  An open-ended period of conduct involves "a threat of continued racketeering activity" and may be established by a showing that there is a "specific threat of repetition extending indefinitely into the future," or "that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business."  *H.J. Inc.*, 492 U.S. at 242–43; *see also Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122–24 (5th Cir. 1996).  Again, the narrow focus at trial on Pereida's purchases does not support the broader characterizations of the fraud made on appeal.  A finding of open-ended continuity would also be at odds with the sale of PCI, the grading company that was a key part of the alleged fraud, in December 2011, before Malvino uncovered the fraud or filed this suit.  *See Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008) (finding that when the defendant had "terminated any allegedly fraudulent scheme" prior to suit, there was no open-ended continuity).

The evidence is thus not like the allegations in *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007), which we found sufficient to survive a Rule 12(b)(6) dismissal.  The *Abraham* complaint alleged a scheme to induce hundreds of Indian citizens to borrow thousands of dollars to travel to the United States only to find on arrival "things were not as they had been promised." *Id.* at 356.  The plaintiffs claimed the scheme involved multiple illegal transactions and many victims, and, based on the facts alleged, there was "no reason to suppose

that this systemic victimization allegedly begun in November 2000 would not have continued indefinitely" if not for the lawsuit. *Id.* In contrast, there is no evidence from which to conclude that the fraud Pereida fell victim to would have continued indefinitely but for this lawsuit as there was no evidence of other victims and PCI was no longer part of Defendants' operation.

The district court therefore clearly erred in finding a pattern of racketeering. That requires vacating the judgment against Anthony and PCA for both substantive RICO and RICO conspiracy. *See Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 552 (5th Cir. 2012) (explaining that RICO conspiracy under section 1962(d) requires "an injury from an act that is independently wrongful under RICO").

## IV

The deficient evidence concerning the pattern of activity RICO requires would not, however, undermine a finding of common law fraud—the kind of state law cause of action RICO's pattern requirement sought to preserve. The district court made such a liability finding on the common law torts, but did not enter judgment on those claims because RICO provides the greater recovery (both treble damages and attorneys' fees). Defendants request that we treat Malvino's election of RICO remedies as final and binding and enter a take-nothing judgment against Malvino. Defendants recognized at oral argument that the alternative would be a remand to allow the district court to consider entering judgment on Malvino's fraud, negligent misrepresentation, and civil conspiracy claims—a decision from which another appeal could follow.

The latter course is appropriate. When a plaintiff prevails on both federal and Texas state law causes of action for the same injury, federal courts apply Texas's one satisfaction rule, which requires the prevailing party to elect between the alternative claims for purposes of recovery. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 335–36, 336 n.45 (5th Cir. 2008).

14

Malvino elected the RICO remedy for Defendants Anthony and PCA. He "reserve[d] his right to a re-election of remedies in the event that [the] RICO . . . judgment were to be reversed on appeal."

Defendants do not cite any authority holding that a plaintiff cannot change his election if the claim he elected to recover on is reversed on appeal. Nor could we find any, and the equitable nature of the one satisfaction rule counsels against such a stringent approach. *See Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 112 (Tex. App.–Houston 2012) (holding that "the rationale behind the 'one-satisfaction' rule" dictates that the doctrine is concerned with "the *satisfaction* of a judgment, not the *obtaining* of a judgment"). The rule operates to prevent a plaintiff from recovering twice for the same wrong, not to prevent a plaintiff from recovering once. *See Vickery v. Vickery*, 999 S.W.2d 342, 373 (Tex. 1999) ("A plaintiff is entitled to one satisfaction for sustained injuries."); *Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 293 (Tex. App.–San Antonio 2011, reh'g overruled) ("The sole purpose of the doctrine of election of remedies is to prevent double recovery for a single wrong." (quoting *Weeks Marine, Inc., v. Salinas*, 225 S.W.3d 311, 322 (Tex. App.–San Antonio 2007, pet. dism'd))); *see generally Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371–72 (7th Cir. 1990) (discussing the common law history of election of remedies and explaining that the substantive aspect of the doctrine is just a bar on double recovery). Our decision to vacate the judgment on the RICO claims means there would no longer be a double recovery if judgment were entered on the common law claims, so we remand for the district court to consider whether to do so. *United States v. United Techs. Corp.*, __ F. Supp. 3d __, 2016 WL 3141569 at *3 (S.D. Ohio, June 3, 2016) (allowing the government to seek an alternative remedy on remand after a damages award was vacated on appeal because the government's prior election to seek damages rather than disgorgement was not

No. 15-41435

final as "any attempted election of one of two alternative remedies is not effective unless and until the plaintiff actually obtains the remedy it elected").

**\* \* \***

We REVERSE the judgment and REMAND the case to the district court. We place no limitation on what the district court may consider on remand or on what decisions it may make.