# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 4, 2024

Lyle W. Cayce
Clerk

———————

No. 22-11148

———————

D&T Partners, L.L.C., *successor in interest to* ACET Venture Partners, *directly and derivatively on behalf of* ACET Global, L.L.C. and Baymark ACET Holdco, L.L.C.; ACET Global, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Baymark Partners Management, L.L.C.; Super G Capital, L.L.C.; SG Credit Partners, Incorporated; Baymark ACET Holdco, L.L.C.; Baymark ACET Direct Invest, L.L.C.; Baymark Partners; David Hook; Tony Ludlow; Matthew Denegre; William Szeto; Marc Cole; Steven Bellah; Zhexian "Jane" Lin; Dana Marie Tomerlin; Padasamai Vattana; Paula Ketter; Vanessa Torres; Windspeed Trading, L.L.C.; Julie Smith; Hallet & Perrin, PC; Baymark Management, L.L.C.,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-1171

———————————————————————

Before Jones, Haynes, and Douglas, *Circuit Judges*.
Dana M. Douglas, *Circuit Judge*:

No. 22-11148

A group of individuals allegedly sought to steal the assets and trade secrets of an e-commerce company. They did so with shell entities, corrupt lending practices, and a fraudulent bankruptcy. The question in this case is whether the scheme, as alleged, violates the Racketeer Influenced and Corrupt Organizations Act (RICO). We hold that it does not. While the complaint alleges coordinated theft, the alleged victims are limited in number, and the scope and nature of the scheme was finite and focused on a singular objective. Because this does not constitute a "pattern" of racketeering conduct sufficient to state a RICO claim, we AFFIRM the district court's judgment.

I

D&T Partners, LLC (D&T) operated a successful company that specialized in online retail. Perhaps encouraged by D&T's success, another company, Baymark Partners (Baymark), approached D&T with a proposition it could not refuse: Baymark sought to purchase D&T's assets in exchange for a sum of money and multimillion-dollar promissory note. To effectuate the sale, Baymark created a new company, ACET Global (Global), to take the operational reins from D&T, hold the transferred assets, and pay the substantial promissory note.

Following the sale from D&T, Global took out a separate term loan from another entity, Super G3 (Super). D&T agreed to subordinate its security interest to Super as part of that transaction. It did so after Baymark insisted that D&T's former management would remain at the helm of Global.

But less than a year after the sale, things began unraveling. Baymark reneged on its assurances to D&T and replaced Global's CEO with an alleged crony, who accepted the new role free of charge. According to the complaint, this new executive caused Global to default on its payment to Super and enter a forbearance agreement, waiving loan payments until just days before the D&T promissory note would become due. In the meantime, the same CEO

2

created another company named "Windspeed"—an entity in which Baymark and Super both had an ownership interest.

After Windspeed's creation, next began the "critical steps of Global's 'wind down' plan." The scheme involved transferring Global's assets, operations, inventory, customer lists, marketplaces, and employees to Windspeed. Super, for its part, gave this new assetless entity $200,000 with the expectation that Windspeed would eventually acquire Global's assets.

Problems only compounded for Global. When the forbearance period with Super ended, Global defaulted on the loan. It then defaulted on the promissory note payment due to D&T. Purporting to respond to the nonpayment, Super issued a faux notice of forfeiture to take possession of Global's assets. There was, however, a problem: D&T no longer had anything to foreclose on after the transfers to Windspeed. Making matters worse, the same law firm—Hallett & Perrin—authored Windspeed's company agreement, discussed the fraudulent asset transfer with Baymark, drafted the foreclosure sale agreement for Super, and represented Baymark, Global, and Windspeed during the foreclosure sale.

Global declared bankruptcy shortly after the default. In doing so, it filed a petition in bankruptcy court with several misrepresentations. Numbered among them, Global representatives distorted the value of its assets and lied about its finances. When interested parties got wind of these problems, Defendants undertook an extensive cover-up. Emails and electronic documents went missing, and websites and other online traces mysteriously vanished from the internet. According to the complaint, Defendants destroyed evidence, obstructed legal proceedings, and contradicted their own testimony.

No. 22-11148

Citing Defendants'[1] nefarious scheme to loot Global's assets, D&T filed suit in federal court under RICO. After two amendments,[2] D&T's complaint spans 194 pages and alleges various unlawful racketeering acts, including wire fraud, mail fraud, obstruction of justice, bankruptcy fraud, and money laundering. Such conduct, according to D&T, resulted in several millions of dollars in unpaid debts due to D&T and other creditors. After D&T filed its second amended complaint, Defendants moved to dismiss the lawsuit, arguing that D&T failed to state a RICO claim. The district court agreed and dismissed all D&T's claims with prejudice, concluding that D&T was unable to plead a pattern of racketeering activity.[3] D&T says that the court's holding was in error and timely appealed.[4]

II

We review dismissal for failure to state a claim de novo. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 116 (5th Cir. 2019). In doing so, we accept all well pled facts as true and determine whether plaintiff's complaint states a plausible claim for relief. *Id.*

---

[1] The complaint lists several Defendants. Defendant–Appellees filed two separate briefs. One brief was filed on behalf of Marc Cole and SG Credit Partners, Inc. Defendants–Appellees Baymark Partners Management, L.L.C., Baymark ACET Holdco, L.L.C., Baymark ACET Direct Invest, L.LC., Baymark Partners, David Hook, Tony Ludlow, Matthew Denegre, and Baymark Management, L.L.C., and Julie Smith and Hallett & Perrin, P.C., filed a separate brief.

[2] The district court granted Defendants' first rounds of motions to dismiss but gave D&T the opportunity to amend its complaint.

[3] The district court dismissed as moot the motions to dismiss filed by the law firm, Hallett & Perrin, Julie Smith, the Windspeed Employees, Windspeed, and William Szeto.

[4] Several weeks before oral argument, several parties to this appeal were involved in bench trial in a Texas state district court. Following oral argument, the district court issued a ruling finding several Defendants liable for, among other claims, breach of contract, breach of fiduciary duty, and violations for the Texas Uniform Fraudulent Transfer Act.

No. 22-11148

A

To eradicate "organized crime in the United States," Congress passed the Racketeer Influenced and Corrupt Organizations Act, a legislative package that provided the government "new weapons of unprecedented scope" targeting organized crime at "its economic roots." *Russello v. United States*, 464 U.S. 16, 26 (1983). Among the new tools for prosecutors, RICO established innovative evidence-gathering procedures, created criminal prohibitions, and provided enhanced sanctions and remedies for victims. *United States v. Turkette*, 452 U.S. 576, 589 (1981). Putting its provisions to use, the government has employed RICO to take down leaders from notorious crime outfits across the country. But even while "[o]rganized crime was without a doubt Congress' major target," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245 (1989), RICO's central aim is prohibiting "patterns" of crimes conducted through an "enterprise," no matter where or how such patterns occur.

RICO is also more than a criminal statute. When drafting the legislation, Congress incorporated provisions in RICO that allow private plaintiffs to seek redress in federal court. If their lawsuit succeeds, the statute provides a big payout: Plaintiffs are entitled to triple damages, court costs, and attorney's fees. 18 U.S.C. § 1964(c). Even so, pursuing that recovery is often a challenging undertaking. Problems typically arise at the pleadings stage, as courts are hesitant to find RICO violations, and plaintiffs have difficulty alleging them. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 785 (7th Cir. 1994) (Cudahy, J., concurring) ("RICO is a judge's nightmare and doggedly persistent efforts to hammer it into a rational shape deserve the utmost respect even though they can rarely accomplish the impossible."). The root of the trouble stems from the statute's vague language. As explained in more detail below, the requisite RICO pleading standards are far from explicit, and the RICO jurisprudence offers courts (and plaintiffs) little guidance. *See H.J. Inc.*, 492 U.S. at 256 (Scalia, J.,

dissenting) ("[T]he highest Court in the land has been unable to derive from this statute anything more than . . . meager guidance.").

B

By its terms, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

Pointing to that language, D&T believes Defendants' actions fall "squarely within RICO's crosshairs." Over four years, D&T says Defendants engaged in a "series of elaborate, sophisticated, and coordinated acts of deception" with one mission in mind: "fraudulently siphon [Global's] trade secrets and assets for its own benefit, transfer those assets from the reach of creditors and hide and conceal their conduct." Such a scheme, D&T alleges, caused harm to more than twenty-four RICO victims, including the bankruptcy trustee and Global's creditors.

In pursuing this action, D&T brings claims under three subsections of the RICO statute. *See id.* §§ 1962 (a), (c) & (d).[5] Though the subsections are distinct, each shares three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)).

The crux of this case involves element two—whether Defendants engaged in a "pattern of racketeering activity." A pattern, according to

---

[5] The claims under subsections (c) and (d) are against all Defendants, while the claim under subsection (a) is against Baymark Partners, Ludlow, Hook, Denegre, Super G, SG Credit, BP Management, Smith, and Hallett & Perrin. Because these claims have the same elements, we analyze them together.

RICO, requires at least two predicate criminal actions. 18 U.S.C. § 1961. But that is where the statute's guidance ends. Even so, it is well established that the word "'pattern' . . . was meant to import," *H.J. Inc.*, 492 U.S. at 255 (Scalia, J., dissenting), something more than simply "[e]stablishing the minimum number of predicates." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992). Yet determining what that "something" is "has proved to be no easy task." *H.J. Inc.*, 492 U.S. at 236. In attempting to fill the void, the Supreme Court has offered some contour: "To establish th[e] pattern [element,] a plaintiff must show both a relationship between the predicate offenses . . . and the threat of continuing activity." *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016). These two elements are termed "relationship" and "continuity."

Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). "Continuity," by comparison, is a "temporal concept." *Id.* In noting Congress's goal of addressing "*continuing* racketeering activity," the Court offered a framework for putting the "continuity" principle into practice: A RICO plaintiff can prove "continuity" by alleging "a closed period of repeated conduct," or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Respectively, these precepts are known as "closed" and "open-ended" continuity. In utilizing this amorphous framework, however, the Supreme Court directed judges to employ a "commonsense approach" and consider the specific facts of each case. *Id.* at 237.

Though no one contests the "relationship element" of the pattern analysis, the parties here dispute whether D&T's complaint alleges closed or open-ended continuity. We address each theory in turn.

No. 22-11148

1

To start, a party can demonstrate continuity over a closed period by alleging a series of related criminal acts extending over a "substantial period of time." *Id.* at 242. In pursuing this particular RICO theory, D&T says that Defendants engaged in a scheme involving several acts of deception over four years. D&T outlines over 100 predicate acts in its amended complaint, including mail and wire fraud, obstruction of justice, money laundering, and bankruptcy fraud.[6] D&T believes that allegations of such acts carried out over multiple years are sufficient to survive the pleading stage.

But pleading continuity is not as straightforward as D&T seems to suggest. Because continuity depends on the specific facts of each situation, no one test can be fixed "in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists." *Id.* at 243. While other circuits have considered an explicit range of factors, we have engaged in highly fact-intensive analyses to determine whether closed-ended continuity was present in any given case.

Even without specific factors, however, several recurrent principles have emerged. Perhaps unsurprisingly, one crucial consideration in the closed-ended continuity analysis is the duration of the alleged racketeering scheme. When drafting RICO, Congress sought to address "*long-term* unlawful conduct," not fraudulent acts "extending over a few weeks or months." *Id.* at 242. But what timeframe is prolonged enough to be considered "long-term"? For our part, we have presumed that more than a year of racketeering acts constitute a "substantial period of time." *See, e.g.*, *Abraham*, 480 F.3d at 356 (holding that two years was sufficient); *United States v. Bustamante*, 45 F.3d 933, 941–42 (5th Cir. 1995) (holding that racketeering acts extending nearly four years suffice).

---

[6] For purposes of this analysis, we conclude that *at least two* of the nearly 100 alleged predicate acts meet the plausibility standard. *See* 18 U.S.C. § 1961.

In this case, D&T's complaint alleges racketeering conduct occurring over "four years." Taking those allegations as true, we presume that such a period is "substantial" for RICO purposes. Affording D&T this presumption, however, does not end the inquiry, for the duration of the alleged unlawful conduct is not a dispositive factor. *See H.J. Inc.*, 492 U.S. at 242. Though it certainly carries significant weight, we have, on several occasions, considered other facts when engaging in the RICO pattern analysis.

One consideration, for instance, is the number of victims injured by the alleged racketeering acts. Our opinion in *Abraham v. Singh*, 480 F.3d at 356, offers one example. In that case, we found continuity when an alleged racketeering scheme involved "systematic victimization." *Id.* The complaint alleged a two-year scheme to induce hundreds of Indian citizens to borrow money and travel to the United States for employment, only to find on arrival "things were not as they had been promised." *Id.* Specifically, the transplants were housed in poor conditions and unable to find jobs, or alternatively, "farmed out" for inadequate pay. In finding continuity, we stressed the plan's effect on "multiple victims," and concluded that the plaintiffs' complaint alleged "a continuity of racketeering activity, or its threat." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 356); *see also Malvino*, 840 F.3d at 232 (noting the extent of the affected victims).

By contrast, we—and our sister circuits—have been skeptical of RICO allegations when the victims of the alleged racketeering conduct are limited. *See W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. v. Mkt. Square Assocs.*, 235 F.3d 629, 635 (D.C. Cir. 2001); *see also Wade v. Hopper*, 993 F.2d 1246, 1251 (7th Cir. 1993) ("While the absence of multiple schemes or victims is not dispositive, it is instructive."); *Efron v. Embassy Suites, Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) (concluding plaintiff failed to plead closed-ended continuity in part because of the limited number of victims). This is because the idea of "continuity" embraces "predicate acts occurring at different points in time or involving different victims." *Morgan v. Bank of*

*Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). Though by no means conclusive, courts (including this one) have found the absence of multiple targeted victims relevant to the continuity inquiry. *See, e.g.*, *Malvino*, 840 F.3d at 233 (considering evidence of "other victims" under the RICO pattern analysis); *see also Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 530 (1st Cir. 2015) (considering number of victims); *Grubbs v. Sheakley Grp.*, 807 F.3d 785, 804 (6th Cir. 2015) (same); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (same); *Vicom*, 20 F.3d at 780 (same).

Here, D&T contends that Defendants' fraudulent scheme "duped" twenty-four victims in its effort to steal Global's assets. Notably, however, the complaint does not allege that the victims were targeted repeatedly through broad-based criminal conduct. Instead, the alleged victims suffered a derivative injury stemming from Global, who was the only targeted victim of the underlying transaction. D&T implies as much in its second amended complaint: It recounts that the objective of Defendants' unlawful acts was to "siphon off [] Global's trade secrets and assets." Such a circumstance weighs against a finding of continuity. Unlike the "systematic victimization," discussed in *Abraham*, D&T and other creditors shared in a lone injury from a lone operation directed at a lone victim. *W. Assocs.*, 235 F.3d at 635 ("To the extent that Western's partners were injured, they were injured indirectly, which does not make them individual victims under RICO.").

Apart from the duration and the number of victims, another helpful consideration is whether the unlawful conduct concerns one or multiple schemes. If numerous schemes are alleged, such allegations are "highly relevant" to the continuity inquiry and tend to support such a finding. *H.J. Inc.*, 492 U.S. at 240. On the other hand, courts are reluctant to find a RICO violation when the complaint alleges unlawful conduct in pursuit of a "single effort, over a finite period of time." *Efron*, 223 F.3d at 21. To be clear, a viable RICO case need not involve multiple schemes. *H.J. Inc.*, 492 U.S. at 237.

Nevertheless, courts have stressed that "a single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities" is not the type of racketeering "pattern" RICO seeks to prohibit. *See SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990); *see also Efron*, 223 F.3d at 19 ("Our own precedent firmly rejects RICO liability where "the alleged racketeering acts . . ., 'taken together, . . . comprise a single effort' to facilitate a single financial endeavor." (quoting *Schultz v. Rhode Island Hosp. Tr. Nat. Bank, N.A.*, 94 F.3d 721, 732 (1st Cir. 1996))).

For our part, we have found that no RICO liability exists when a plaintiff alleges "multiple acts of fraud that were part and parcel of a single, discrete and otherwise lawful commercial transaction." *Word of Faith*, 90 F.3d at 123; *see Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 244 (5th Cir. 1988). This principle was made explicit in *Word of Faith World Outreach Center Church, Inc. v. Sawyer*, 90 F.3d at 123. There, the plaintiffs asserted RICO claims based on a network's critical investigation report of three televangelists. The racketeering acts alleged by the plaintiffs included "interstate transportation of stolen computer disks," "theft of donations, Church mail, and other Church property," "wire fraud," and "obstruction of justice." *Id.* at 121. Despite these allegations, we concluded that plaintiffs "failed to plead a 'continuity of racketeering activity or its threat.'" *Id.* at 123 (quoting *H.J. Inc.*, 492 U.S. at 241). In so holding, we reasoned that the alleged fraudulent acts were components of a broader plan with one single objective: producing "television news reports concerning a particular subject." *Id.* And such a "discrete," otherwise lawful endeavor posed no threat of "continuous activity" and was therefore insufficient for RICO purposes.

Relatedly, we have also examined the alleged objective of the scheme and whether its goals were finite. Consider our ruling in *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d at 244. In that case, several plaintiffs accused an equipment dealer of numerous RICO violations concerning the

acquisition of certain dealerships. The district court dismissed the complaint and we affirmed. In doing so, we concluded that the conduct did not constitute a RICO "pattern," in part, because the scheme came to its logical conclusion, and as a result, Defendants could not have posed a "continuous threat as RICO persons." *Id.*; *see also In re Burzynski*, 989 F.2d 733, 743 (5th Cir. 1993) ("*All* of the alleged predicate acts took place as part of the *Burzynski I* litigation, which has ended.").

Although D&T's complaint here cites several instances of fraud, the nature and singular objective of the underlying transaction do not support a finding of closed-ended continuity. This is because the unlawful actions all related to a single scheme targeted at Global. By D&T's own admission, that finite scheme achieved its goal once Defendants transferred Global's assets to Windspeed Trading, LLC. Additionally, Defendants' criminal undertaking was part and parcel of an otherwise lawful commercial endeavor—that is, a loan default and its resulting foreclosure. *See Word of Faith*, 90 F.3d at 123. Though D&T has deconstructed several acts of fraud throughout the transaction, doing so was "a transparent effort to make [Defendants'] alleged fraudulent conduct seem more expansive." *See W. Assocs.*, 235 F.3d at 635.

D&T nevertheless counters that the Defendants' unlawful actions did not end with the transfer. It emphasizes that Defendants sought to "cover up" their conduct by lying at depositions and deleting virtual files relevant to their liability. Yet the complaint only claims that Defendants were attempting to conceal the fraudulent predicates of their criminal undertaking. And such actions, "even if themselves illegal . . . 'do nothing to extend the duration of the underlying scheme.'" *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 474 (7th Cir. 2007) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992)).

Simply put, what began as an ordinary business transaction ended with stolen assets, a defunct company, and many unhappy creditors. Even if Defendants engaged in fraudulent acts in the interim, the complaint alleges

that the acts arose in pursuit of a single end: transferring Global's assets to Windspeed. While the plan ultimately took several years to realize, the number of victims and the nature and objective of the alleged scheme do not support an inference of a closed-ended pattern of racketeering activity. On this basis, we must affirm the district court's ruling.

2

Without a closed-ended pattern, a plaintiff may nevertheless state a RICO claim by alleging "open-ended" continuity. This exists when a threat of continuing criminal activity extends indefinitely into the future. To establish this element, plaintiffs must show that the predicate acts "are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *H.J. Inc.*, 492 U.S. at 243. In alleging an open-ended continuity theory here, D&T contends that Defendants' scheme to drain Global dry was not an isolated occurrence. It claims that Defendants engaged in similar schemes to advance a modus operandi: illegally acquiring significant equity stakes in companies for very little, or no, capital outlay.

Whether a plaintiff has alleged an open-ended pattern of continuity turns on whether the predicate acts themselves pose a "*threat* of continuity." *Id.* at 241. An open-ended pattern may exist when the predicates "involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.* at 242. To illustrate this point, the Supreme Court offered a hypothetical where a "hoodlum" extorted money from business owners, telling the businesses he would reappear each month to collect premiums that insured against window breakage. Even though these predicate acts were small and occurred close together, the Court reasoned that in time, the racketeering acts themselves had the threat of repetition extending indefinitely into the future. *Id.* at 242–43.

Pleading an identical or analogous fact pattern, however, is not the sole way to establish an indefinite threat of RICO activity. A plaintiff can

also prove open-ended continuity by establishing that a defendant commits the predicate acts or offenses as its "regular way of doing business." *Id.* at 242. This may be done by showing that the entity repeats its fraud in similar business settings or would employ the underlying fraud against Defendants indefinitely. *See Efron*, 223 F.3d at 19.

D&T cites two other lawsuits against Defendants to show open-ended continuity here. These lawsuits, D&T asserts, support its theory that the scheme Defendants committed was all part of their ongoing fraudulent enterprise targeting select companies. The lawsuit D&T claims is most "strikingly similar" to the case at hand involved a borrower that had defaulted on multiple notes. *Greb v. Singleton*, No. 3:18-CV-01439, 2019 WL 13210371, at *1 (N.D. Tex. Sept. 30, 2019). The creditor there sought foreclosure on the properties pledged as collateral. The borrower countered that the creditor had inflated the amount owed and was seeking millions more than it could get by simply collecting on the loans. *Id.* Despite seeking alternative financing and buyers, the borrower ultimately agreed to sell his interest to Baymark. *Id.* at *2. At the time of the sale, however, the borrower was unaware that the creditor and Baymark struck a deal where the creditor would advance Baymark the funds to purchase the borrower's interest, and the creditor would take an interest in the profits of any resale. *Id.* A short time later, Baymark resold the entity for more than double what it had paid the borrower. *Id.* The borrower sued, alleging violations under the RICO statute.

That case was dismissed at the pleadings stage, and in D&T's 194-page complaint, it hardly describes the alleged similarities or underlying predicate acts that resemble D&T's allegations.[7] The other RICO lawsuit

---

[7] In its brief, D&T raises another case involving Super, not included in its complaint. But we will not address the new unpled facts, as appellate courts may not consider new evidence furnished for the first time on appeal and may not consider facts

D&T cites was based on "healthcare fraud"—an issue wholly unrelated to the claims in this complaint. In any event, the complaint again provides limited facts. As we have recognized, "[p]leading the mere existence of lawsuits is not the same as pleading the facts that demonstrate predicate illegal acts as the defendant's regular way of doing business." *Word of Faith*, 90 F.3d at 124.

Above all, D&T has not alleged how Defendants' criminal activity would continue in the future. As noted above, Defendants' scheme was finite and reached its "natural conclusion" once it drained Global's assets. And because Global "became economically defunct" once its assets were "siphon[ed] off," there was nothing more for the Defendants to loot. *GICC Cap. Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 466 (2d Cir. 1995) ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."). Though D&T contends that Defendants seek new fraudulent acquisition opportunities, D&T has not identified any other target companies. At best, there is the allegation that Defendants may, at some point, foreclose on collateral again in another transaction. But absent additional facts, the complaint does not plead a threat of future criminal conduct. That reality also requires that we affirm the district court's ruling.

### III

Finally, D&T contends that the district court erred in dismissing the complaint without granting leave to amend. We review "the district court's decision to grant a motion to dismiss with or without prejudice only for abuse of discretion." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009). D&T's claim is meritless for a least two reasons. For one thing,

---

which were not before the district court at the time of the challenged ruling. *See Theriot v. Par. of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999).

No. 22-11148

D&T's argument is based on the general principle that leave to amend should be "freely given." FED. R. CIV. P. 15(a)(2). But no mention is made of the district court's several reasons for dismissing D&T's complaint with prejudice. In relevant part, the district court concluded that doing so was "appropriate in this case" because,

> Plaintiffs' Second Amended Complaint [was] their third bite at the apple and the second time the Court [had] assessed the sufficiency of their allegations. Moreover, Plaintiffs [] opted for volume over clarity in their amendments by adding more to the complaint—including, at times, full pages of deposition transcripts—without establishing how the facts fit into their RICO claims. More importantly, the Court [found] that given the nature of Plaintiffs' allegations, further attempts to replead the singular transaction at issue as a "pattern of racketeering" would be futile and a waste of the parties' and Court's resources.

"A party forfeits an argument . . . by failing to adequately brief the argument on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). "To be adequate, a brief must address the district court's analysis and explain how it erred." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023) (citation omitted). Because D&T does not address the district courts stated reasons for dismissal, it forfeits any argument that the district court abused its discretion. *Id.*

And even if its argument was not waived, D&T had no right to amend its complaint for a third time. This is particularly so after the court cautioned D&T that, after the first amendment, it had "one chance" to rectify its deficient pleadings. "[L]eave to amend properly may be denied when the party seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003). Having made such an express finding in the record, the district court did not err in concluding that an amendment would be futile.

No. 22-11148

## IV

For the reasons above, we AFFIRM the district court's ruling in all respects.